# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LABMD, INC., | **No. 2:15-cv-** |
| Plaintiff, | |
| v. | |
| TIVERSA HOLDING CORP. f/k/a TIVERSA, INC.; ROBERT J. BOBACK; M. ERIC JOHNSON; and DOES 1-10, | **ELECTRONICALLY FILED** |
| Defendants. | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

"*The Committee on Oversight and Government Reform is investigating the activities of Tiversa, Inc., a company upon which the Federal Trade Commission ("FTC") relied as a source of information in its enforcement action against LabMD, Inc. Information the Committee recently obtained indicates that the testimony provided by company officials to federal government entities may not have been truthful.*

*The Committee's ongoing investigation has shown that competing claims exist about the culpability of those responsible for the dissemination of false information. It is clear at this point, however, that the information provided to the FTC is incomplete and inaccurate. A witness in the proceedings against LabMD, Inc. recently testified to the Committee that he provided incomplete or inaccurate information to the FTC regarding the origin of a '1718' document.*"

> - Darrell Issa, Chairman, Congress of the United States, House of Representatives, Committee on Oversight and Government Reform

Plaintiff LabMD, Inc. ("Plaintiff" or "LabMD"), by and through counsel, brings this action against Defendants Tiversa Holding Corp. f/k/a Tiversa, Inc. ("Tiversa"), Robert J. Boback ("Boback"), M. Eric Johnson ("Johnson") (collectively, Tiversa, Boback, and Johnson are referred to as "Defendants"), and DOES 1-10, and alleges the following:

## NATURE OF THE ACTION

1.     This is an action to recover millions of dollars in damages that Defendants intentionally caused to LabMD, through a multi-year, nationwide, continuing racketeering scheme and conspiracy, which decimated LabMD, a privately owned cancer testing facility. At its peak, LabMD employed approximately 40 medical professionals, but, as a result of Defendants' actions, it is now nothing more than an insolvent shell of a company.

2.     In the past year, Boback, Tiversa's Chief Executive Officer, has admitted to Congress and/or the FTC that Defendants: (i) lied about the source of LabMD's alleged data security breach, and (ii) lied by saying that they had detected purported identity thieves downloading LabMD's files from the internet. While LabMD has always believed that it was treated poorly by Defendants, it did not know until Boback's recent admissions that Defendants had made these material misrepresentations.

3.     Defendants, led by Boback, designed their scheme for the purpose of commercially benefitting from the fear mongering that stemmed from privacy and data security breaches, some of which were of their own creation. As former FTC Commissioner J. Thomas Rosch once explained: Tiversa "is a commercial entity that has a financial interest in intentionally exposing and capturing sensitive files on computer networks, and a business model of offering its services to help organizations protect against similar infiltrations." (*See*

Dissenting Statement of Commissioner J. Thomas Rosch, a true and correct copy of which is attached hereto as Exhibit "A").

4.       In the instant matter, Tiversa, at Boback's direction, hacked into LabMD's computer in Georgia, and then attempted to sell LabMD services to remedy the very breach Tiversa created. Tiversa first spun a yarn about identity thieves downloading LabMD's client data from the internet and then analogized to the "widely reported file sharing breach of Supreme Court Justice Stephen Breyer's SSN and personal data." (*See* July 15, 2008 email from Boback to LabMD, a true and correct copy of which is attached hereto as Exhibit "B"). When LabMD refused to purchase Tiversa's services, Defendants turned LabMD in to the FTC (for the very breach Tiversa created), and then used LabMD's client files as the subject of Defendants' report about data security.

5.       Defendants' scheme has employed various fraudulent and otherwise tortious methods, including: making misrepresentations to LabMD, the FTC, Congress, the media, and the public; converting LabMD's property, and; defaming LabMD. Defendants engaged in this scheme to directly target and harm LabMD.

## PARTIES

6.       Plaintiff is a corporation organized and existing under the laws of the state of Georgia with its principal place of business located in Fulton County, Georgia.

7.       Defendant Tiversa is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 606 Liberty Avenue, Pittsburgh, Allegheny County, Pennsylvania 15222.   Tiversa can be served with process through its President, Robert Boback, at 606 Liberty Avenue Pittsburgh, PA 15222, or wherever he may be found.

8.     Defendant Boback is an individual citizen of the state of Pennsylvania, is over the age of 18, and can be served with process at 606 Liberty Avenue Pittsburgh, PA 15222, or wherever he may be found.

9.     Defendant Johnson is an individual citizen of the state of Tennessee, is over the age of 18, and can be served with process at 401 21st Avenue South, Nashville, Davidson County, Tennessee 37203, or wherever he may be found.

10.     DOE Defendants 1-10 are and were, at all relevant times, citizens of the United States; are as-yet unidentified individuals or entities that actively participated in and/or materially benefitted from the illicit conduct detailed herein; and will be substituted with the proper names of these individuals or entities as they become available.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that (a) it is between citizens of different states, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

12.     Defendants Tiversa and Boback are subject to the jurisdiction of this Court because they are citizens of the state of Pennsylvania. Defendant Johnson is subject to this Court's jurisdiction because, at all times relevant to this action, he regularly and continuously transacted business in the state of Pennsylvania. Additionally, Johnson is subject to this Court's jurisdiction pursuant to the conspiracy theory of jurisdiction.

13.     Venue for this action lies in this judicial district and division pursuant to 28 U.S.C. § 1391(b).

## FACTS

14.     The Committee on Oversight and Government Reform of the United States House of Representatives (the "Oversight Committee") is currently investigating Defendant Tiversa, the self-proclaimed world leader in peer-to-peer cyber-intelligence. Because of Tiversa's purported expertise in cyber-intelligence, the Federal Trade Commission (the "FTC") initiated investigations or enforcement actions against multiple companies, including Plaintiff LabMD, after receiving information from Tiversa that was, by Tiversa's owns admission, incomplete and inaccurate. "Tiversa was benefiting commercially from the fact that the FTC was investigating the companies that Tiversa itself referred to the FTC" and, upon information and belief, Tiversa manipulated the FTC in order to enrich itself. (*See* June 17, 2014 and July 18, 2014 letters from Darrell Issa to the FTC, true and correct copies of which are attached hereto respectively as Exhibits "C" and "D").

15.     Defendant Boback is, and has been at all times relevant to this action, Tiversa's Chief Executive Officer who oversees all of its operations.

16.     Johnson was employed by Dartmouth College ("Dartmouth") as the Director of the Tuck School of Business's Glassmeyer/McNamee Center for Digital Strategies. He is no longer employed by Dartmouth.

17.     In 2005, Tiversa, Boback, and Johnson (collectively, "Defendants") began working together on cyber security issues. In connection with their agreement to work together, Defendants executed a nondisclosure agreement.

18.     In July 2007, Defendants and representatives of the Federal Trade Commission (the "FTC") testified before the U.S. Senate Oversight and Government Reform Committee (the "Oversight Committee") about the dangers of peer-to-peer networks. According to Boback, "the

FTC looked foolish in the 2007 testimony," and "they reached out … to [Tiversa], based on that, in an effort to try to educate themselves on what was going on with peer-to-peer, because, frankly, they didn't know, in my opinion." (November 21, 2013 FTC Deposition of Robert Boback at 139-40 (a true and correct copy of which is attached hereto as Exhibit "E")).

19.     Following the July 2007 Oversight Committee testimony, Defendants began working with the FTC to provide security breach information that Defendants allegedly found on peer-to-peer networks. To facilitate these activities, and to try to shield themselves from investigation or liability, Defendants created The Privacy Institute, a Delaware non-profit organization that was dissolved in 2013. As Boback recently admitted, The Privacy Institute was set up "to provide some separation from Tiversa from getting a civil investigative demand at Tiversa, primarily." (*See* Exhibit "D").

20.     On several occasions between May and July 2008, Tiversa and Boback contacted LabMD by telephone and email and represented that Tiversa had obtained a 1,718 page file from LabMD containing sensitive and confidential patient data (the "1718 File") from a peer-to-peer network, and that Tiversa "continued to ***see individuals … downloading* copies** of the [1718 File]." (Emphasis added). As detailed below, Boback recently admitted this statement was false. Tiversa and Boback made misrepresentations to LabMD for the purpose of soliciting its business, specifically to try to persuade LabMD to use Tiversa's "Incidence Response Services" (collectively, the "Solicitations"). (True and correct copies of some the Solicitations are attached hereto as Exhibit "F"). LabMD refused the Solicitations, but in good faith reliance on these misrepresentations, it spent thousands of dollars, and devoted hundreds of man hours, to seek to detect and remedy what were, in truth, phantom data breaches, including by conducting searches related to the 1718 File.

21.     In retaliation for LabMD's refusal to purchase Tiversa's services, Tiversa and Boback "fed" LabMD to Johnson for an upcoming research report. Johnson's initial search had "turned up some interesting stuff," but it was "not as rich" as he had hoped. Johnson asked Tiversa to "share a couple other of [its] recent medical finds … to ***spice up the report*** [and] … ***really boost the impact of the report***." (*See* April 29, 2008 email exchange among Tiversa representatives and Johnson, a true and correct copy of which is attached hereto as Exhibit "G" (emphasis added)). Upon information and belief, as soon as Tiversa realized that LabMD would not give in to the Solicitations, Defendants decided to use LabMD and its 1718 File to "spice up" Johnson's report.

22.     In further retaliation for LabMD's refusal to purchase Tiversa's services, Tiversa and Boback, through The Privacy Institute, provided the 1718 File to the FTC. Mirroring their misrepresentations to LabMD, Tiversa and Boback falsely told the FTC that Defendants had obtained the 1718 File from a peer-to-peer network and that third party individuals were downloading the 1718 File from a peer-to-peer network. These misrepresentations caused the FTC to investigate LabMD and to bring an enforcement action against it in 2010.

23.     Boback met with FTC representatives, including Alain Sheer ("Sheer") and Ruth Yodaiken, attorneys with the FTC's Bureau of Consumer Protection, on at least two occasions in 2009, and discussed LabMD in at least one of those meetings. (*See* Ex. "E" at 141). Additionally, through The Privacy Institute, Defendants provided information to the FTC on purported data breaches at "roughly 100 companies," including the 1718 File.

24.     Some or all of the information Defendants provided to the FTC was inaccurate or incomplete, including how they obtained the 1718 File. Boback has recently admitted to the Oversight Committee that Defendants' representations to the FTC with respect to the 1718 File

were false. (*See* Exhibits "C" and "D"). In 2009, Boback made similar misrepresentations to United States House of Representatives Subcommittee on Commerce, Trade and Consumer Protection (the "CTC"). In fact, when testifying before the CTC, Boback even produced a version of the 1718 File in which first names, dates of birth, and/or group insurance numbers of patients were not redacted.

25.     Shortly after Defendants provided misinformation on "roughly 100 companies" (Boback's words) to the FTC, the FTC announced that it had notified "almost 100 organizations" (the FTC's words) that personal information had been shared from their respective computer networks and was available on peer-to-peer networks and that it was investigating some or all of these companies. LabMD was one of the organizations that the FTC investigated.   That investigation resulted in an enforcement action against LabMD for alleged failure to reasonably protect the security of consumers' personal data, including medical information. The FTC would not have investigated LabMD, much less commenced an enforcement action against it, but for the false information about LabMD that Defendants provided to the FTC through The Privacy Institute.

26.     Several days after the above-described FTC announcement, the FTC, through Sheer, and Defendants worked with *Computerworld* to publicize the FTC's investigation. Excerpts from the *Computerworld* coverage include:

> Alain Sheer, an attorney with the FTC's Bureau of Consumer Protection, said that as part of the investigations, the FTC will collect information from each company to see if they may have violated data privacy laws. Generally, such investigations are the first step toward a formal compliant being lodged against a company by the FTC, Sheer told *Computerworld* ….

> "We were happy to see that the FTC [has] finally started recognizing that P2P [peer-to-peer] is a main source for criminals to gain access to consumer's personally identifiable information for ID theft and fraud," Boback said. Complying with the FTC's request for information could prove to be an

"extensive and cumbersome" task for the affected companies, he said. … [¶] A crackdown by the FTC against those involved in such breaches could benefit companies such as Tiversa, which help businesses figure out if they are leaking protected data on P2P networks. In fact, 14 of the companies contacted by the FTC over the leaks have already contacted Tiversa for help, Boback said.

The FTC's actions have been a long time coming and highlight the growing concerns over inadvertent leaks on P2P networks, said Eric Johnson, a professor of operations management at Dartmouth College's Tuck School of Business. … [¶] Johnson alone has found numerous health care documents on P2P networks. One was a 1,718-page document containing Social Security numbers, dates of birth, insurance information, treatment codes and other health care data belonging to about 9,000 patients of a medical testing laboratory. … [¶]  "The FTC has been following this for a long time," Johnson said. "They have been under a reasonable amount of pressure to do something to go after companies" that have exposed sensitive data on file-sharing networks.

(True and correct copies of articles comprising some of *Computerworld's* coverage are attached as Exhibit "H").

27.     Defendants all benefitted from the FTC's investigations that they instigated. Not only did a number of targets of the investigations retain, or at least contact, Tiversa for its putative expertise, but Johnson received funding from the U.S. Department of Homeland Security, among other federal agencies, for his work with Tiversa in investigating data breaches on peer-to-peer networks. As Boback described it:

"Tiversa provided the engine, if you will, for Dartmouth's research. … Tiversa allowed Dartmouth to provide whatever search terms they were interested in searching for. We input that into our system. It went out and issued the searches. The downloads of which were downloaded to a Dartmouth hard drive that Tiversa had no visibility or access to. So, by that, I mean, engine."

(*See* Ex. E at 134-35). Johnson testified that all of the files that he examined in conducting the research that led a paper entitled "Data Hemorrhages in the Health-Care Sector" (the "Johnson Paper") were provided to him by Tiversa. (*See* February 18, 2014 FTC Deposition of M. Eric Johnson at 26 (a true and correct copy of which is attached hereto as Exhibit "I")).

28.     In April 2009, Johnson, with the assistance of Tiversa and Boback, published the Johnson Paper. The Johnson Paper was based on "[e]xperiments … conducted in collaboration with Tiversa … [and] supported by the U.S. Department of Homeland Security…." The Johnson Paper included a redacted excerpt of the 1718 File, which it described as follows: "For a medical testing laboratory, we found a 1,718-page document containing patient Social Security numbers, insurance information, and treatment codes for thousands of patients. … All together (sic), almost 9,000 patient identities were exposed in a single file, easily downloaded from a P2P network." (A true and correct copy of the Johnson Paper is attached hereto as Exhibit "J"). Boback has recently admitted that the Johnson Paper includes incomplete and inaccurate information about LabMD and the 1718 File.

29.     Following the publication of the Johnson Paper, Johnson published other articles, spoke at industry symposiums, and gave interviews with similar misrepresentations about LabMD and the 1718 File.

30.     Not until he was deposed by the FTC on November 21, 2013 did Boback admit that he and Tiversa had misled LabMD, the FTC, the Oversight Committee, the media, and the public with respect to whether the 1718 File had been downloaded from a peer-to-peer network or by anyone other than Defendants, who, upon information and belief, actually obtained the 1718 File by hacking into LabMD's computer server. Boback testified:

> Q.     Now, the e-mail [to LabMD] states, downloading as opposed to just searching for?
> A.     Yep.
> Q.     What is the information that you have about the downloading of that file?
> A.     ***As far as the downloading, maybe I misspoke this time. We continue to see people searching for it.*** If people search for things for long enough, one can assume they downloaded it. … I mean, they are clearly searching for it with the name of the file, so, therefore, we assume that they were downloading it as well.

Q.    … Do you have a sense about how many people were conducting these searches or how many searches there were?
A.    I don't.

(See Ex. "E" at 94-95 (emphasis added)). To date, Boback has not identified any specific searchers (including whether the lone searches were actually LabMD's own investigators).

31.    In 2014, Boback confessed to further misrepresentations about LabMD and the 1718 File. In an interview with the Oversight Committee in the Spring of 2014, Boback admitted that, despite their prior assertions to the contrary, Defendants never knew the source of the 1718 File, let alone that it was an Internet Protocol ("IP") address in San Diego as Boback had testified in his November 2013 FTC deposition. In particular, Boback testified this time:

Q    How did you determine that it was incomplete or that there was a problem with the spread analysis?
A    I had . . . [Tiversa Employee A] perform[] an analysis, again, remember, data store versus the peer to peer. So the information in the data store, he performed another analysis to say, what was the original source of the file from LabMD and what was the disclosure, a full analysis of it which then provided to me, which expanded upon what [Tiversa Employee B] had told me when I asked [Tiversa Employee B] prior to my testimony. And the only reason why I asked [Tiversa Employee B] in the first place was because [Tiversa Employee B] was the analyst on it at the time when it was found, so I asked the analyst who was most familiar with this. I didn't know [Tiversa Employee B] was going to provide me with less than accurate information.
* * *
*Q    So at the time that you were first made aware of the 1718 document in April, May of 2008, Tiversa employees had not conducted the spread analysis?*
*A    No.*
*Q    And you did not know the original source of the 1718 document?*
*A    I did not. No.*
* * *
*Q    Did there come a point at which a Tiversa employee determined who the original source of the 1718 document was?*
*A    Well, that's — yes. A Tiversa employee told me who the original source was … just before I testified … in the deposition [in the FTC LabMD case] in November of last year [2013]. And, subsequently, we have done a new search and found that the origin was different than what was provided to me . . . in November.*

11

(*See* Exhibit "C" (emphasis added)).

32.     In sum, Boback has now admitted, under oath, (i) that the source of the 1718 File was not an IP address in San Diego, and (ii) that, as far as Defendants know, no one has ever downloaded the 1718 File from a peer-to-peer network. The prior representations of Defendants have thus only recently been confirmed to be false.

33.     Defendants' misrepresentations have been financially devastating to LabMD, in large party by precipitating the FTC's investigation and enforcement action against it. As a direct consequence of the FTC's proceedings, including the attendant adverse publicity and the administrative burdens that were imposed on LabMD to comply with the FTC's demands for access to current and former employees and the production of thousands of documents, LabMD's insurers cancelled all of the insurance coverage for LabMD and its directors and officers, and LabMD lost virtually all of its patients, referral sources, and workforce, which had included around 40 full-time employees.  Consequently, LabMD was effectively forced out of business by January 2014, and it now operates as an insolvent entity that simply provides records to former patients.

34.     At all times, LabMD handled protected health information in full compliance with applicable law, including HIPAA's privacy and data security regulations. To the best of LabMD's knowledge, no one has ever complained or alleged that they were harmed by anything LabMD did, or did not do, with respect to privacy and data security. In fact, upon information and belief, an FBI investigation into LabMD's purported data breach did not find any violation of law or other instance of wrongdoing by LabMD.

12

35.     The 1718 File is, and has always been, LabMD's property. Nonetheless, despite LabMD's repeated requests to Defendants to return the 1718 File to LabMD, they have refused to do so.

36.     Defendants have published false and defamatory statements about LabMD to third parties (the "Defamatory Statements"), including statements that refer to LabMD's trade and profession that were calculated to injure it therein and were disparaging words productive of special damage which flows naturally therefrom. Defendants have not issued retractions or corrections of any of the Defamatory Statements.

37.     The Defamatory Statements have severely damaged LabMD's brand, reputation, and goodwill.

## CAUSES OF ACTION

### COUNT I:  CONVERSION
**(Against all Defendants)**

38.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein.

39.     Without permission or authority, Defendants unlawfully converted, for their own use and benefit, the 1718 File, which is LabMD's property.

40.     As the result of Defendants' conversion of LabMD's property, LabMD has been injured and suffered damages in an amount to be determined at trial.

### COUNT II:  DEFAMATION *PER SE*
**(Against all Defendants)**

41.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein.

42.     Defendants published the Defamatory Statements without privilege.

43.     Defendants made the Defamatory Statements without regard to the truth of the statements, or in the alternative, made such statements out of malice towards LabMD.

44.     Pursuant to both Pennsylvania and Georgia law, the Defamatory Statements constitute defamation *per se*.

45.     LabMD's reputation was damaged as a result of the Defamatory Statements.

46.      LabMD has suffered, and is continuing to suffer, damages and loss of business relationships as a result of the Defamatory Statements.

47.     LabMD is entitled to recover damages from Defendants for this defamation *per se* in an amount to be proven at trial.

**COUNT III:  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(Against all Defendants)**

48.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein.

49.     By engaging in the above described misconduct, Defendants have substantially harmed and/or seriously jeopardized LabMD's reputation and goodwill in the healthcare industry and its existing and prospective business relationships with patients, referral sources, and others.

50.     Defendants knew or should have known that the above described misconduct would substantially harm and/or seriously jeopardize LabMD's reputation and goodwill in the healthcare industry and its existing and prospective business relationships with patients, referral sources, and others.

51.     Defendants are strangers to these business relationships.

52.     In acting in the manner described above, Defendants acted improperly, without privilege, purposely, and with malice and intent to injure LabMD.

53.     As the proximate result of Defendants' interference with its business relationships, LabMD has been damaged in an amount to be proven at trial.

### COUNT IV:  FRAUD
**(Against Defendants Tiversa and Boback)**

54.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein.

55.     In order to induce LabMD to obtain its services, Tiversa and Boback falsely told LabMD, among other things, that Tiversa had obtained the 1718 File from a peer-to-peer network and that Tiversa "continued to see individuals … downloading copies of the [1718 File]."

56.     At the time Tiversa and Boback made these knowingly false statements, they intended to mislead and had actual knowledge that they were deliberately misleading LabMD.

57.     Tiversa and Boback's actions in making knowingly false statements to LabMD were willful, wanton, outrageous, and in conscious disregard of LabMD's rights under law.

58.     LabMD justifiably relied on the representations of Tiversa and Boback, primarily because they professed to be experts in the field of cyber security.

59.     LabMD's good faith reliance on these misrepresentations was to its detriment because it spent thousands of dollars, and devoted hundreds of man hours, to seek to detect and remedy the phantom data breaches intentionally and fraudulently manufactured by Tiversa and Boback.

60.     As a direct and proximate result of the fraudulent misrepresentations of Tiversa and Boback, LabMD has suffered damages in an amount to be proven at trial.

## COUNT V:  NEGLIGENT MISREPRESENTATION
**(Against Defendants Tiversa and Boback)**

61.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein.

62.     Tiversa and Boback were negligent and failed to disclose material facts to LabMD by falsely representing to it that, among other things, Tiversa had obtained the 1718 File from a peer-to-peer network and that Tiversa "continued to see individuals … downloading copies of the [1718 File]."

63.     Tiversa and Boback knew or should have known that the foregoing and above described representations were false when made.

64.     Tiversa and Boback had a duty to refrain from making the foregoing and above described false representations.

65.     Tiversa and Boback each breached their respective duty by making the foregoing and above described false representations.

66.     It was reasonably foreseeable to Tiversa and Boback that LabMD would rely on such false or incomplete information, and LabMD did so to its detriment.

67.     As a direct and proximate result of the negligent misrepresentations of Tiversa and Boback, LabMD has suffered, and is continuing to suffer, substantial damages.

68.     Accordingly, LabMD is entitled to damages for the negligent misrepresentations of Tiversa and Boback in an amount to be proven at trial.

## COUNT VI:  CIVIL CONSPIRACY
**(Against all Defendants)**

69.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein.

70.     Defendants have a common design and purpose to achieve their goal of commercially benefitting from misrepresentations about data security breaches, which specifically harmed LabMD through Defendants': (i) conversion of LabMD's property; (ii) Defamatory Statements relating to LabMD's trade and profession; and (iii) interference with LabMD's business relations.

71.     Defendants have acted in concert with an unlawful, malicious, and willful common purpose, and with unlawful means, to: (i) convert LabMD's property; (ii) defame LabMD; and (iii) interfere with LabMD's business relations.

72.     Defendants took overt acts in furtherance of this unlawful, conspiracy.

73.     LabMD has sustained damages as a direct and proximate result of Defendants' unlawful conspiracy. These damages include loss of profits and damage to and loss of its reputation and goodwill.

74.     Defendants' actions are a direct and proximate cause of significant harm to LabMD.

75.     Defendants are jointly and severally liable to LabMD for damages in an amount to be proven at trial.

**COUNT VII:  VIOLATION OF RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)
(Against all Defendants)**

76.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein

77.     At all relevant times, LabMD is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

78.     At all relevant times, each of Defendants is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

79.     Defendants were employed by or associated with an "enterprise" engaged in and whose activities affect interstate commerce within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). The common purpose of the Enterprise is to commercially benefit by making misrepresentations about data privacy and security breaches to unsuspecting consumers, government agencies, the media, and the public, and to otherwise engage in tortious activities that advance their purpose.

80.     Defendants are each associated with the Enterprise. Each conducts and participates in the Enterprise's affairs. Boback manages, operates, and directs the affairs of the Enterprise. He identifies potential victims, solicits them, and, if they agree to his solicitations, has them enter agreements with Tiversa that result in them transferring money directly to Tiversa. If the target refuses Boback's solicitations, as did LabMD, Boback, through Johnson, uses the target as a sacrificial lamb for the Enterprise, and correspondingly engages in a campaign of defamation and tortious interference.

81.     Defendants agreed to, and knowingly, intentionally, and willfully participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity, and for the unlawful purpose of harming Plaintiff and others.

82.     Defendants intentionally and willingly devised and participated in a scheme to harm LabMD and others in an effort to deprive LabMD of assets and property, and knowingly and intentionally used the interstate mails, in violation of 18 U.S.C. § 1341, and interstate wires, in violation of 18 U.S.C. § 1343, as integral and essential devices to advance, further, and facilitate that scheme.

83.    For example, and without limitation, in furtherance of that scheme:

(a)    Boback and Tiversa used the mail and/or federal wires to transmit the Solicitations;

(b)    each of Defendants used the mail and/or federal wires to make the Defamatory Statements, including by giving interviews, transmitting articles, and issuing statements;

(c)    each of Defendants used the mail and/or federal wires to convert the 1718 File; and

(d)    each of Defendants used the mail and/or federal wires to make misrepresentations about LabMD and others, through the Privacy Institute to the FTC.

84.    The foregoing acts of mail fraud and wire fraud constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). As detailed in the foregoing allegations, Defendants acted with an unlawful purpose, and with unlawful means, to: (i) convert LabMD's property; (ii) defame LabMD; and (iii) interfere with LabMD's business relations.

85.    Defendants utilize mail and wire fraud to accomplish and further the Enterprise's fraudulent scheme and Defendants' actions are violations of public policy, violations of state statutes, and affect interstate commerce.  The nature of Defendants' predicate acts involve a distinct threat of long-term racketeering activity.

86.    The acts committed by Defendants are not isolated events, but represent a pattern of deceptive, fraudulent, and illegal practice occurring on a regular basis.  Defendants are associated in such a manner as to form on ongoing organization, formal or informal, and function as a continuing unit.

87.     By direct and proximate reason of Defendants' pattern of racketeering activity and the predicate acts it comprises, LabMD has suffered injuries, including money damages in an amount to be proven at trial.

88.     The injuries LabMD has suffered as a result of Defendants' violation of 18 U.S.C. § 1962(b) are separate and distinct from the injuries that LabMD has suffered as a consequence of Defendants' individual predicate acts of Conversion, Defamation *Per Se*, and Tortious Interference with Business Relations.

**COUNT VIII:  VIOLATION OF RICO, 18 U.S.C. § 1962(d)**
**(Against all Defendants)**

89.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein

90.     Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Defendants agreed and conspired to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity involving mail fraud in violation of 18 U.S.C. § 1341 and wire fraud, in violation of 18 U.S.C. § 1343.

91.     Defendants each knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes describe above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

92.     As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, including without limitation those detailed in Count VII (above), and violations of 18 U.S.C. § 1962(d), LabMD has suffered an injury in an amount to be proven at trial.

## COUNT IX: PUNITIVE AND TREBLE DAMAGES
**(Against all Defendants)**

93.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein

94.     Based on the facts as set forth above, Defendants' actions have demonstrated willful misconduct, malice, fraud, wantonness, oppression, or that entire want to care which would raise the presumption of conscious indifference to consequences. Defendants have further acted with specific intent to cause LabMD harm. Accordingly, LabMD is entitled to an award of punitive damages against Defendants.

95.     LabMD is additionally entitled to a compulsory award of treble damages as a result of Defendants' RICO violations.

## COUNT X: ATTORNEYS' FEES AND EXPENSES OF LITIGATION
**(Against all Defendants)**

96.     LabMD reincorporates each of the foregoing paragraphs as if they were fully set forth herein.

97.     LabMD is entitled to recovery of its attorneys' fees and court costs pursuant to 18 U.S.C. § 1964(c).

98.     Moreover, Defendants have acted in bad faith toward LabMD in the events giving rise to this lawsuit, have been stubbornly litigious, and have put LabMD to unnecessary trouble and expense. Pursuant to Georgia law, O.C.G.A. § 13-6-11, LabMD is entitled to recover from Defendants its expenses of litigation, including reasonable attorneys' fees in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, LabMD, Inc. respectfully prays for the following relief:

(a)     that LabMD receive a trial by jury;

(b)     that the Court enter judgment in favor of LabMD, and against Defendants, jointly and severally, on Counts I-III and VI-X of the Complaint, in amount(s) to be proven at trial, including awarding against each Defendant actual, special, consequential and/or compensatory damages, including lost profits;

(c)     that the Court enter judgment in favor of LabMD, and against Boback and Tiversa, jointly and severally, on Counts IV-V of the Complaint, in amount(s) to be proven at trial, including awarding against each Boback actual, special, consequential and/or compensatory damages, including lost profits;

(d)     that judgment be entered awarding to LabMD, and against each Defendant, punitive damages;

(e)     that judgment be entered awarding to LabMD, and against each Defendant, enhanced and/or treble damages;

(f)     that LabMD be awarded its expenses and costs and disbursements of litigation, including its costs and reasonable attorneys' fees;

(g)     that LabMD be awarded pre-judgment and post-judgment interest as provided by Pennsylvania and/or Georgia law; and,

(h)    that LabMD be awarded such other relief as the Court deems just, equitable and

proper.

**JURY TRIAL DEMANDED.**

Respectfully submitted,

FOX ROTHSCHILD LLP

Dated: January 21, 2015          By:    /s/ John R. Gotaskie, Jr.
                                        John R. Gotaskie, Jr.
                                        PA ID No. 81143
                                        625 Liberty Avenue, 29th Floor
                                        Pittsburgh, PA  15222-3115
                                        Telephone:    (412) 391-1334
                                        Facsimile:     (412) 391-6984
                                        jgotaskie@foxrothschild.com

                                        Michael Eric Ross
                                        Georgia Bar No. 615190
                                        *Pro hac vice* (application to be filed)
                                        Eric S. Fisher
                                        Georgia Bar No. 250428
                                        *Pro hac vice* (application to be filed)
                                        TAYLOR ENGLISH DUMA LLP
                                        1600 Parkwood Circle, Suite 400
                                        Atlanta, Georgia 30339
                                        Telephone:    (678) 336-7238
                                        Facsimile:     (770) 434-7376
                                        mross@taylorenglish.com
                                        efisher@taylorenglish.com

                                        *Attorneys for Plaintiff,*
                                        *LabMD, Inc.*