IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LABMD, INC.,                              )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )
                                          )      No. 2:15-cv-00092-MRH-MPK
TIVERSA HOLDING CORP. f/k/a               )
TIVERSA, INC.; ROBERT J. BOBACK;          )
M. ERIC JOHNSON; and DOES 1-10,           )
                                          )
                                          )
            Defendants.                   )

**PLAINTIFF'S OPPOSITION TO DEFENDANTS TIVERSA HOLDING CORP.'S
AND ROBERT J. BOBACK'S MOTION TO DISMISS PLAINTIFF'S
FIRST AMENDED COMPLAINT**

## I.   INTRODUCTION



March 1, 2016 (Twitter): *FBI raids Tiversa office in downtown Pittsburgh*

March 3, 2016 (Databreaches.net): *Was the company involved in FTC charges against LabMD raided by the FBI?*

March 17, 2016 (Reuters): *Exclusive: DOJ probes allegations that Tiversa lied to FTC about data breaches*

"Federal agents are investigating whether cyber-security firm Tiversa gave the government falsified information about data breaches at companies that declined to purchase its data protection services, according to three people with direct knowledge of the inquiry."

March 23, 2016 (Techdirt.com): *Cybersecurity Firm With A History Of 'Corporate Blackmail' Raided By The FBI*

On November 21, 2013, Plaintiff LabMD took testimony from Tiversa CEO Robert

Boback[1] that led to LabMD noticing the deposition of Tiversa employee Richard E. Wallace.

Boback then fired Wallace after Wallace told Boback he would not lie under oath.[2]

On April 2, 2014, Wallace blew the whistle on Tiversa when he disclosed to LabMD that

Tiversa had gotten away with lying to Congress, the Federal Trade Commission, LabMD and

others for many years.[3]

Since April 2, 2014:

- Tiversa has been investigated by and lied to Congress.[4]
- Wallace's exposure of Tiversa's lies caused the FTC to withdraw Boback's testimony and all of Tiversa's evidence relied upon by the FTC, leading the FTC to lose its enforcement action against LabMD.[5]
- The FBI raided Tiversa headquarters on March 1, 2016.[6]
- Boback was terminated or put on leave.
- Tiversa dismissed its frivolous state court defamation action filed against LabMD, Michael J. Daugherty and Richard E. Wallace in retaliation for the exposure of Tiversa's lies.[7]

In its motion to dismiss, Tiversa claims that what Wallace disclosed on April 2, 2014, is

nothing but old news – that LabMD knew about Tiversa's lies years ago.  Although Tiversa

---

[1] First Amended Complaint ("FAC"), para. no. 93 (ECF No. 125).

[2] *See* accompanying declaration of Michael J. Daugherty ("Daugherty Decl."), para. nos. 66 – 71; FAC, para. no. 125.

[3] Daugherty Decl. para. no 92; FAC, para. nos. 39, 44, 46, 48, 50, 52, 54, 56, 58, 85, 98, 102, 105,  122 and 1

[4] OGR Report (ECF No. 63-1); FAC, para. nos. 2, 5 and127.

[5] *See* fn. 3 on p. 61 of Complaint Counsel's Corrected Post-Trial Brief filed on August 12, 2015, in In the Matter of LabMD, Inc., available as of January 28, 2016, at https://www.ftc.gov/enforcement/cases-proceedings/102-3099/labmd-incmatter; and November 13, 2015 Initial Decision, available at https://www.ftc.gov/enforcement/cases-proceedings/102-3099/labmd-inc-matter.

[6] *See* https://twitter.com/laserwolverine/status/704695046684205056/photo/ 1?ref_src=twsrc%5Etfw; http://www.databreaches.net/was-the-company-involved-in-ftc-charges-against-labmd-raided-by-the-fbi/; http://mobile.reuters.com/article/ businessNews/idUSKCN0WK027, all available on April 8, 2016.  A copy of each of these publications is attached to Daugherty Decl. as Exhibit AA.

[7] Daugherty Decl. para. no 59; FAC, para. no. 121.

chronicles a long history of claims, allegations and lawsuits between it and LabMD, it never answers the obvious question - why LabMD did not sue Tiversa for fraud or defamation before April 2, 2014?  The facts (and logic) answer that question.  LabMD did not know and had no reason to know that Tiversa lied to the FTC.[8]  In addition, Tiversa was actively concealing its lies.[9]  Tiversa nevertheless argues that (1) LabMD had actual knowledge of Tiversa's lies long ago, (2) if LabMD did not have actual knowledge, the Court should bestow constructive knowledge on LabMD because, according to Tiversa, LabMD did not investigate with reasonable diligence, (3) Tiversa never concealed anything, fraudulently or otherwise and (4) LabMD is not entitled to any equitable considerations for tolling any of the statutes of limitations here.  Tiversa contorts LabMD's allegations and interjects so many of its own "facts" that its brief reads more like a trial brief than a brief in support of a motion to dismiss.

Between May 13, 2008, when LabMD was first contacted by Boback, and April 2, 2014, when Tiversa's lies were first exposed, LabMD's investigation included consultation with at least 24 attorneys at 11 different law firms (including Reed Smith), not one of whom thought Tiversa had lied to the FTC and not one of whom recommended that LabMD sue Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO.[10]  If Tiversa's lies were as obvious as Tiversa now claims they were, why did no one else even think Tiversa had lied and how could so many attorneys overlook such "obvious" claims?

---

[8] Daugherty Decl., para. nos. 8 – 27,  33, 34, 37, 45, 57, 62 - 65, 70, 79, 82, 86, 87, 91, 92 and 102 – 112; FAC, para. nos. 39, 42, 44, 46, 48, 50, 52, 54, 56, 58, 69, 85, 93, 94, 102, 105, 117 and 128.
[9] *Id.*
[10] Daugherty Decl., para. nos. 9 – 21 and 45.

On September 30, 2010, LabMD sent inquiries to Tiversa regarding its theft of LabMD's 1718 File.[11]  After Tiversa ignored the letter and after the FTC refused to back down, LabMD sued Tiversa in Atlanta, Georgia on October 19, 2011, for Tiversa's theft of the 1718 File.[12]  *During the pendency of that case*, Tiversa sued LabMD and its chief executive officer in federal court in Pittsburgh for their public statements that Tiversa stole LabMD's 1718 File.[13]  *During the pendency of that case*, Tiversa sued LabMD and Mr. Daugherty, again, as well as LabMD's law firm and Wallace, for defamation in the Allegheny County Court of Common Pleas.[14] Tiversa then dismissed its federal case on the eve of discovery.[15]  Tiversa recently dismissed its state court suit, which was also on the eve of discovery.[16]  Tiversa fails to acknowledge that (1) it and LabMD have been in litigation over Tiversa's theft of the 1718 File on a *non-stop* basis ever since October 19, 2011[17] and (2) Tiversa has maneuvered to avoid discovery at every turn.[18]  In

---

[11] Daugherty Decl., para. nos. 24 – 27; FAC, para. no. 101.

[12] Daugherty Decl., para. no. 32; FAC, para. no. 106.

[13] Daugherty Decl., para. no. 51; FAC, para. no. 120.  Tiversa's defamation case was assigned to the Honorable Nora Barry Fischer.  *Tiversa Holding Corp. v. LabMD, Inc.*, 2014 U.S. Dist. LEXIS 54632, 2014 WL 1584211 (W.D. Pa. Apr. 21, 2014).  It, too, dealt with Tiversa's theft of the 1718 File.  Examples of the allegedly defamatory statements at issue in Tiversa's case are noted in Judge Fischer's opinion at *15: "Tiversa, a company providing data protection and review services, and styling itself as a cyber-intelligence company, is accused of using proprietary software to illegally search private files and use said files to extort other companies into engaging Tiversa's services. (Docket No. 31 at ¶¶ 27-35). Tiversa is also accused of  [16] collusion in government shakedowns involving the FTC. (Id. at ¶¶ 29, 33). Given Tiversa's line of business, it is undisputable that such statements, as pled by Plaintiffs, could clearly damage Tiversa's reputation and motivate current and/or potential clients to avoid interacting with Plaintiffs."

[14] FAC, para. no. 121.

[15] Daugherty Decl., para. nos. 21, 55 – 57.

[16] This recent dismissal is submitted as proof of Tiversa's pattern and practice.  It is admissible under Rule 406 of the Federal Rules of Evidence: "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."

[17] Daugherty Decl., Exhibit Z.

[18] Daugherty Decl., para. nos. 34, 55 – 57 and 59.

the meantime, in the FTC Enforcement Action, Reed Smith attorneys entered notices of appearance (on May 13, 2014, May 15, 2014 and October 15, 2014)[19], filed documents advocating for Tiversa and against LabMD[20] and represented Boback in his depositions (on November 21, 2013 and June 7, 2014)[21].  Tiversa now argues that LabMD has not been reasonably diligent in discovering Tiversa's lies, that LabMD has slept on its rights, that Tiversa was surprised by this lawsuit and that Tiversa has been prejudiced by LabMD's delay.  The only thing Tiversa has been surprised about is that its lies were exposed on April 2, 2014.  And the FBI raid.

Tiversa has actively and constantly interfered not only with LabMD's investigative efforts but other investigative efforts as well.  Tiversa was served a civil investigative demand by the FTC (Summer 2009), a *subpoena ad testificandum* and a *subpoena duces tecum* by the FTC (September 2013), a *subpoena ad testificandum* by LabMD (January 2014) and a congressional subpoena (June 2014).  On each occasion, Tiversa failed and refused to produce responsive documents or witnesses.[22]

As to Tiversa's arguments that several of the defamatory statements at issue are absolutely privileged, Tiversa is confused about privileges.  Statements Tiversa made to the FTC Investigators do not fall within the judicial privilege primarily because they were not made in connection with a civil suit and were not made to judges, attorneys, witnesses or parties in the course of or pertinent to any stage of judicial proceedings.  Such statements are more akin to statements given to law enforcement officers.  Those kinds of statements are covered, if at all,

---

[19] Daugherty Decl., para. no. 76 and 88.
[20] Daugherty Decl., para. no. 86.
[21] Daugherty Decl., para. no. 62 and 83.
[22] Daugherty Decl., para. nos. 97, 99, 100, 101, 105, 109 and 112; FAC, para. no. 86 – 91, 134 and 136.

only by a conditional or qualified privilege which do not apply when a defamer acts with malice

or negligence (as LabMD alleges here). *Bargerstock v. Wash. Greene Cmty. Action Corp.*, 397

Pa. Super. 403, 411, 580 A.2d 361 (1990).

## II.     ARGUMENT AND CITATION OF AUTHORITIES

### A.     The Discovery Rule

Under Pennsylvania's discovery rule, a "statute of limitations does not begin to run until

the plaintiff [1] has discovered his injury or, [2] in the exercise of reasonable diligence, should

have discovered his injury." *Dinicola v. DiPaolo*, 945 F. Supp. 848, 861 (W.D. Pa. 1996).

Discovering an injury means *more* than just knowing one has suffered a harm.  In Pennsylvania,

it means knowing that one has been injured *and* by who or what cause. *Vernau v. Vic's Mkt.,*

*Inc.,* 896 F.2d 43, 46 (3d Cir. 1990) ("once a plaintiff possesses the salient facts concerning the

occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue

his claim"); *Gleason v. Borough of Moosic*, 609 Pa. 353, 363, 15 A.3d 479 (2011) ("The *sine*

*qua non* of the factual inquiry…is the determination whether, during the limitations period, the

plaintiff was able, through the exercise of reasonable diligence, to know that he or she had been

injured and by what cause"); *Wilson v. El-Daief*, 964 A.2d 354, 600 Pa. 161 (2009) (to grant

summary judgment, evidence must "unambiguously establish notice of injury and cause"); *Fine*

*v. Checcio*, 582 Pa. 253, 268, 870 A.2d 850 (2005)("Rather, the statute is tolled, and does not

begin to run until the injured party discovers or reasonably should discover that he has been

injured and that his injury has been caused by another party's conduct."); *Pocono International*

*Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 85, 468 A.2d 468 (1983) ("the "discovery

rule" exception arises from the inability, despite the exercise of diligence, to determine the injury

or its cause").   Tiversa admits this important aspect of the discovery rule on p. 8 of its brief (ECF No. 138, p. 15) but then ignores it.

The discovery rule applies in defamation cases like this.  *Villare v. Healogics, Inc.,* 2015 U.S. Dist. LEXIS 69324 at *18, 2015 WL 2445058 (M.D. Pa. May 19, 2015); *Barron v. St. Joseph's Univ.*, No. 01-3063, 2002 WL 32345690, at *8-9 (E.D. Pa. Jan. 17, 2002) (denying motion to dismiss defamation claim based on discovery rule); *Simmons v. Poltrone*, 1997 U.S. Dist. LEXIS 20512 (E.D. Pa. Dec. 17, 1997) (citing *DiNicola v. DiPaolo*, 945 F. Supp. 848, 861 (W.D. Pa. 1996)

The first question in the discovery rule analysis is whether allegations in the First Amended Complaint establish that LabMD had *actual knowledge* that Tiversa and Boback lied to the FTC more than a year before this action was filed.  Tiversa claims that LabMD actually knew that it lied to the FTC as early as September 30, 2010 (the date of LabMD's inquiry letter to Tiversa) and no later than October 19, 2011 (the day the Georgia Action was filed).  Tiversa repeatedly makes this claim as shown in the following statements:

- "Specifically, in September of 2010 … LabMD sent Tiversa a letter requesting a host of information, and accusing Tiversa of the very same actions alleged here." (ECF No. 138, p. 8);

- "…LabMD made *all* of the relevant allegations it claims to only have learned on April 2, 2014 well prior to that time…." (ECF No. 138, p. 19 (emphasis in original));

- "…LabMD was in fact *actually aware* and had purported expert evidence, no later than 2012 (and well earlier in most instances) of each of the allegations it now claims only to have learned of in 2014." (ECF No. 138, p. 22 (emphasis in original));

But Tiversa is not entitled to re-write LabMD's September 30 2010 letter or LabMD's allegations in the Georgia Action to suit its needs here.  A simple review of those documents shows that LabMD did *not* accuse Tiversa of lying to the FTC (as LabMD does here) and did not sue Tiversa for fraud, defamation, negligent misrepresentation or tortious interference with

7

existing or prospective contractual relations (as LabMD does here).  In short, there is no

allegation anywhere, or any claim even remotely related to the allegation, that Tiversa lied to the

FTC.

There is no doubt that LabMD has firmly believed for years that Tiversa took the 1718

Filed directly from a LabMD computer.  Knowing that Tiversa *took* the file, however, is

altogether different from knowing that Tiversa *lied* to the FTC about the file.  Tiversa cannot

point to a single allegation made by LabMD *anywhere*, before April 2, 2014, that Tiversa lied to

the FTC.   It is not in the Georgia Action.  It is not in *The Devil Inside the Beltway* published in

2013.[23]  It is not in the Enforcement Action.  It is not in any correspondence between the parties.

And it is not in Tiversa's federal or state defamation cases against LabMD and Mr. Daugherty.

The next question in the discovery rule analysis is whether a plaintiff, through the

exercise of reasonable diligence, would have known that he or she had been injured and by what

cause.  *Gleason v. Borough of Moosic*, 609 Pa. at 363; cf. *Grant Heilman Photography, Inc. v.

McGraw-Hill Cos*., 28 F. Supp. 3d 399, 411 (E.D. Pa. 2014) ("Under the Third Circuit discovery

rule, the statute of limitations is subject to equitable tolling until 'the plaintiff discovers, or with

due diligence should have discovered, the injury that forms the basis for the claim'").  Tiversa is

correct that rule in Pennsylvania is a "narrower" view of the discovery rule because the court

must not only consider the plaintiff's actual knowledge, it also must consider whether a plaintiff

had constructive knowledge of her injury and its cause.  *Wilson*, 964 A.2d at 362 (2009).  But

Tiversa completely fails to acknowledge that by imposing a "relatively limited notice

requirement,"  "[t]he balance struck in Pennsylvania has been…to submit factual questions

regarding that notice to the jury as fact-finder." *Gleason v. Borough of Moosic*, 609 Pa. 353, 15

---

[23] Daugherty Decl., Exhibit B.

A.3d 479, 2011 Pa. LEXIS 817 (Pa. 2011);  Trial courts in Pennsylvania often get this wrong as shown in the sheer number of cases where summary judgments are reversed.  See, e.g., *Gleason v. Borough of Moosic*, 609 Pa. at 365-66 (summary judgment reversed where it was not "undeniably clear that Appellants did not use reasonable diligence in timely ascertaining their injury and its cause."); *Wilson*, 964 A.2d at 366 (summary judgment reversed because facts did not "unambiguously establish notice of injury and cause"); *Fine v. Checcio*, 582 Pa. at 272 (where patient's injuries were indicative of two distinct phenomena – defendant's negligence or normal swelling - summary judgment reversed where trial court made factual finding that plaintiff had reason to believe that his injuries were caused by defendant's malpractice); *Crouse v. Cyclops Indus.*, 745 A.2d 606, 560 Pa. 394, 404 (2000) (whether plaintiff exercised reasonable diligence in determining whether defendant intended to honor its promises -- and therefore whether he knew or should have known of the breach before the end of 1988 -- was a factual determination for the jury); *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 530 Pa. 320, 327 (1992) (summary judgment reversed where reasonable minds could differ as to whether plaintiff's injury was readily ascertainable); *Simon v. Wyeth Pharms., Inc.*, 2009 PA Super 263, 989 A.2d 356 (2009) (where plaintiff was aware of possible connection between a prescription drug and her breast cancer, it was reasonable for jury to conclude that where medical doctors did not appreciate the risk such that they undertook to warn their patients, it was improbable that a lay person would be cognizant of the connection); *Burnside v. Abbott Laboratories*, 351 Pa. Super. 264, 292, 505 A.2d 973 (1985) (summary judgment reversed where, although plaintiff was aware of her physical abnormalities prior to bar date, it was not clear that she knew or had reason to know that they had been caused by drug ingested by mother); *Cappelli v. York Operating*, 711 A.2d 481 (Pa. Super. Ct. 1998) (summary judgment

9

reversed based on court's finding jury is to determine what constitutes a reasonable time for the plaintiff to discover his injury and its cause); *Drelles v. Mfrs. Life Ins. Co.*, 2005 PA Super 249, 881 A.2d 822 (2005) (summary judgment reversed because it was for a jury to decide whether plaintiff's sophisticated investment skills made him more capable than the average consumer of knowing, through the exercise of reasonable diligence, that defendant misrepresented certain aspects and provisions of insurance policies).

The Third Circuit recognizes that on Pennsylvania statute of limitation issues, questions of reasonable diligence are not suitable for determination based on the pleadings. *Schmidt v. Skolas*, 770 F.3d 241, 252 (3d Cir. 2014) ("Requiring Schmidt to make a showing of reasonable diligence was premature.  The District Court effectively required Schmidt to plead around an affirmative defense in his complaint, which is inconsistent with Rules 8 and 12(b)(6) and with this court's decision in *Barefoot Architect*.").  Tiversa tries to get around this rule by contorting LabMD's allegations beyond recognition.

On the issue of whether LabMD exercised reasonable diligence, LabMD submits the accompanying declaration of Michael J. Daugherty, LabMD's chief executive officer, to show just some of the diligent efforts LabMD undertook to determine why the FTC was so aggressively pursuing a small cancer-detection lab that was the victim of a crime[24] committed by Tiversa:

- From May 13, 2008, through April 2, 2014, LabMD called upon at least 24 attorneys at 11 different law firms to investigate allegations made by Tiversa and the Federal Trade Commission and/or to advise LabMD regarding appropriate actions to take in response to those allegations.[25]

- At no time before April 2, 2014, did any of those 24 attorneys ever suggest to LabMD

---

[24] See, e.g., 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information)
[25] Daugherty Decl., para. nos. 9 – 21 and 45.

that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO.[26]

- At no time before April 2, 2014, did any of those 24 attorneys ever suggest that the FTC was relying upon Tiversa's *lies*.[27]

- LabMD sent inquiries to Tiversa, Dartmouth College and Eric Johnson by letter dated September 30, 2010.  They all failed to respond.[28]

- Other than stating their belief that LabMD had made the 1718 File publicly available on peer-to-peer networks, the FTC investigators refused to tell LabMD the basis for their non-public inquiry and subsequent investigation.[29]

- On October 19, 2011, LabMD filed a complaint against Tiversa, Dartmouth College and Eric Johnson in the Superior Court of Fulton County, Georgia (the "Georgia Action"). The Georgia Action included counts for violations of the Computer and Fraud Abuse Act (18 U.S.C.  1030), computer crimes under O.C.G.A. § 16-9-3, conversion, trespass and punitive damages (but did not include counts for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO).  Because Tiversa, Dartmouth and Johnson filed and eventually succeeded on motions to dismiss the Georgia Action for lack of personal jurisdiction, LabMD was unable to take any discovery from Tiversa, Dartmouth, Johnson or anyone else.[30]

- On December 6, 2012, approximately a year before the Georgia Action concluded, LabMD began a series of attorney-client privileged communications with George L. Stewart, II, Thomas Allen and Mark Melodia, partners at Reed Smith, regarding the possibility of Reed Smith representing LabMD in a lawsuit that LabMD would be filing against Tiversa and Boback in Pittsburgh, if LabMD were unsuccessful in its attempts to overturn the district court's dismissals.  The Reed Smith attorneys never suggested that LabMD might have a claim against Tiversa for fraud, negligent misrepresentation, defamation, tortious interference with actual or prospective contracts, federal RICO or state RICO.  Moreover, the Reed Smith attorneys never suggested that the FTC was relying upon Tiversa's *lies*.[31]

- On September 13, 2013, approximately a month before the Georgia Action *concluded*, Tiversa and Boback filed a defamation lawsuit against LabMD and Daugherty in federal court in Pittsburgh (the "Federal Defamation Action"), which, like the Georgia Action,

---

[26] *Id*.

[27] *Id*.

[28] Daugherty Decl., para. nos. 24 – 27.

[29] FAC, para. no. 100.

[30] Daugherty Decl., para. nos. 32 – 34; FAC, para. no. 106.

[31] Daugherty Decl., para. nos. 38 – 45.

was based on Tiversa's theft of the 1718 File.  LabMD and Daugherty were shocked to learn that *Reed Smith* was representing Tiversa and Boback in that lawsuit.[32]

- On November 4, 2013, Tiversa and Boback dismissed the Federal Defamation Action on the eve of discovery, thereby preventing LabMD from getting *any* discovery from Tiversa or LabMD.[33]

- On September 23, 2014, while the Federal Defamation Action was still pending, Tiversa and Boback filed a Praecipe for Writ of Summons in the Court of Common Pleas of Allegheny County, showing LabMD, Inc. Michael J. Daugherty *and* LabMD's law firm as Defendants (the "State Defamation Action").

- On November 21, 2013, LabMD took Boback's deposition in the Enforcement Action. Boback repeatedly lied in his deposition stating, for example: "I don't recall, specifically, FTC in any conversation, really, bringing up Lab MD, specifically, so if that helps you;" "I have had, in the totality of our time at Tiversa, I have had, what I believe to be, two meetings with the FTC;" and "We [The Privacy Institute] responded to the civil investigative demand exactly to the letter of what we had to, because it was a civil investigative demand. So, whatever the totality of those documents were, we responded accordingly."[34]

- On January 30, 2014, based on what LabMD learned at Boback's deposition, LabMD served a *subpoena ad testificandum* on Tiversa employee Richard E. Wallace ("Wallace") for a deposition to be taken in Pittsburgh on February 18, 2014.  That deposition never occurred because (1) Tiversa terminated Wallace when Wallace told Boback he would not lie under oath to the federal government and (2) Wallace would later refuse to testify based on his Fifth Amendment right against self incrimination.[35]

- On April 21, 2014, less than three weeks after Wallace blew the whistle on Tiversa and Boback, LabMD began a series of meetings with attorneys in the Atlanta office of Greenberg Traurig for advice regarding claims against Tiversa and Boback in Pittsburgh. Several weeks into those discussions, the attorneys at Greenberg Traurig informed LabMD that they had a conflict of interest and, therefore, referred LabMD to attorneys at the law firm of Taylor English in Atlanta, Georgia, for advice regarding claims against Tiversa and Boback in Pittsburgh.[36]

- On June 7, 2014, in Pittsburgh, LabMD took deposition testimony from Boback, again, in the Enforcement Action.[37]

---

[32] Daugherty Decl., para. nos. 21 and 43; FAC, para. no. 120.
[33] Daugherty Decl., para. nos. 55 – 57.
[34] Daugherty Decl., para. no. 63.
[35] Daugherty Decl., para. nos. 66 – 71.
[36] Daugherty Decl., para. nos. 72 – 74.
[37] Daugherty Decl., para. no. 83.

- On August 11, 2014, LabMD engaged attorneys at Taylor English to represent LabMD on claims to be filed against Tiversa and Boback in Pittsburgh.  Those attorneys then engaged other attorneys for assistance in researching for, preparing and filing this action on January 21, 2015, including attorneys at the law firm of Fox Rothschild to represent LabMD as local counsel.[38]

### B.    Fraudulent Concealment and Equitable Tolling

The facts, as alleged in the FAC and as will be shown at trial, establish (1) that Tiversa

constantly attempted to and successfully interfered with LabMD's diligent efforts to learn the

cause of its injuries through active interference, fraudulent concealment, refusals to answer

questions, lying under oath in depositions, lying under oath in an administrative law hearing,

lying under oath to congress, misrepresenting facts, avoiding discovery, intimidating witnesses,

frivolous lawsuits, private and public defamation of LabMD and otherwise, (2) the statute or

limitations should be equitably tolled as of October 19, 2011, because (a) LabMD and Tiversa

have been litigating over Tiversa's theft of the 1718 File *on a non-stop basis* since LabMD's

filing of the Georgia Action[39] and (b) since 2008, Tiversa and Boback have consistently,

vigorously, viciously and vindictively cooperated with the FTC and supported the FTC's non-

public inquiry, investigation and Enforcement Action against LabMD with crimes, lies, deceit,

falsified evidence and perjury.[40]

LabMD's allegations in the First Amended Complaint and facts submitted with this

opposition, support fraudulent concealment, equitable tolling and the discovery rule.  Before

further discussion, however, LabMD notes that it is mindful of this Court's harsh criticisms in its

February 22, 2016 Memorandum Opinion  (ECF No. 129).  With all due respect, the Court's

Memorandum Opinion creates a conundrum for LabMD.  The Court correctly noted that

---

[38] Daugherty Decl., para, no. 74.
[39] Daugherty Decl., Exhibit Z.
[40] Daugherty Decl., Exhibits S and Z and para. nos. 23, 63, 93 – 98.

equitable tolling may not be "generally amenable to resolution on a Rule 12(b)(6) motion," citing *Cunningham et al. v. M&T Bank Corp. et al.*, No. 15-1412, slip op. at 2 (3d Cir. Feb. 19, 2016) (citing *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 301–02 (3d Cir. 2010)), but proceeded to rule that, on a Rule 12(b)(6) motion, it need only look to the calendar and the docket to determine that it would not be "equitable" to apply equitable tolling here. (ECF No. 129, p. 2, fn. 2).  Later in its ruling, however, the Court looked beyond the pleadings to conclude that it found "no basis in the record to exercise its discretion to essentially give an equitable break to a party who waited nearly two years after its first action was over to file here."  (ECF No. 129, p. 4., fn. 3).

Thus, the challenge for LabMD is to convince the Court (without offending the Court, especially given its harsh criticisms) that *if* it would look beyond the pleadings, it would see that there are, in fact, extremely *compelling* reasons for application of the equitable tolling doctrine in this case.  LabMD therefore submits the accompanying declaration of Michael J. Daugherty to add record evidence that, LabMD submits, should convince the Court that, *based on the calendar, court docket information and other facts*, there are multiple, meritorious grounds for equitably tolling *all* of the statutes of limitations here.  To that end, LabMD respectfully requests that the Court consider LabMD's previous arguments and authorities[41] along with the accompanying Daugherty Declaration, with particular attention to the following facts and allegations:

- In 2009, Tiversa incorporated The Privacy Institute, a shell company created solely for Tiversa to secretly transfer *fraudulent* and other documents to the FTC.[42]

- Tiversa's attorneys *regularly* communicated with FTC investigators about the FTC's non-public inquiries, investigations and enforcement actions against LabMD and other companies.[43]

---

[41] ECF Nos. 63, 73, 83, 118, 121 and 124, all of which are incorporated herein by reference.
[42] Daugherty Decl., para. nos. 23, 93 – 98; FAC, para. nos. 86 – 91.
[43] Daugherty Decl., para. no. 91 and OGR Report (ECF No. 63-1).

- As noted above, LabMD sent inquiries to Tiversa, Dartmouth College and Eric Johnson by letter dated September 30, 2010.  They all failed to respond.[44]

- On October 19, 2011, LabMD filed the Georgia Action against a complaint against Tiversa, Dartmouth College and Eric Johnson.  Because Tiversa, Dartmouth and Johnson filed and eventually succeeded on motions to dismiss the Georgia Action for lack of personal jurisdiction, LabMD was unable to take any discovery from Tiversa, Dartmouth, Johnson or anyone else.[45]

- LabMD later discovered that Tiversa and its counsel committed fraud on the court in the district court and in the Eleventh Circuit Court of Appeals.  On January 29, 2016, LabMD filed a Motion to Reopen Case, a Rule 60(d)(3) Motion for Relief From Judgment and a Motion for Discovery in Aid of Plaintiff's Rule 60(d)(3) Motion for Relief from Judgment in *LabMD, Inc. v. Tiversa, Inc. et al.*, in the United States District Court for the Northern District of Georgia, Civil Action No. 1:11-cv-04044-LMM (the Georgia Action).  These motions and all supporting materials, which may be found via PACER at ECF Nos. 31 through 34 in the Georgia Action, are incorporated herein by reference.[46]

- In November 2012, during pendency of LabMD's appeal to the Eleventh Circuit in the Georgia Action, a Tiversa attorney sent a letter to LabMD's general counsel that included the following statements (which are now known to be false):

  > In our conversation, you also described an FTC investigation of LabMD.  We were previously unaware of any such investigation.  You explained that LabMD believes that Tiversa is somehow complicit in the FTC's investigation because the FTC investigation came after LabMD decided it would not hire Tiversa. LabMD's accusation is patently false and baseless.

  > Critically, and contrary to your clients' published false statements, Tiversa did not break into LabMD's system.  Tiversa is not a "thief."  Mr. Daugherty and LabMD know that these specific accusations are false.  As I said to you on the phone, we are willing to sit down and further demonstrate what you and Mr. Daugherty already know through publically available documents: namely, that the file in question could be found and today can still be found at multiple sites in the public domain.[47]

- On September 13, 2013, a month before the Georgia Action concluded, Tiversa filed the Federal Defamation Action but on November 4, 2014, on the eve of discovery, Tiversa dismissed the case.[48]

---

[44] Daugherty Decl., para. nos. 24 – 27.
[45] Daugherty Decl., para. nos. 32 – 34.
[46] FAC, para. nos. 106 – 119.
[47] Daugherty Decl., para. no. 37.
[48] Daugherty Decl., para. nos. 21 and 57.

- Before dismissing the Federal Defamation Action on November 4, 2014, Tiversa filed the State Defamation Action on September 23, 2014.  Tiversa attempted to intimidate LabMD's counsel in the Enforcement Action by including them as a party defendant in the State Defamation Action.[49]

- Tiversa dismissed the Federal Defamation Action after Judge Fischer stated to Jarrod Shaw, "Because if it turns out, as Ms. Counts [counsel for LabMD] says, that maybe Tiversa doesn't have a case, then it seems to me that the honorable thing might be for Tiversa to withdraw their lawsuit."[50]

- Tiversa attempted to intimidate whistleblower and former Tiversa employee Richard E. Wallace by including him as a party defendant on October 31, 2014.  Tiversa timed the addition of Wallace to the State Defamation Action just days before it dismissed the Federal Defamation Action in order to prevent LabMD from removing the State Defamation Action to federal court with a probable assignment to Judge Fischer who would have permitted discovery to proceed after the parties complied with her earlier referral to Early Neutral Evaluation.[51]

- In a letter dated October 17, 2013, to LabMD's counsel, Reed Smith attorney Jarrod Shaw (acting on behalf of Tiversa and Boback) stated as follows (all of which is now known to be false):

  > If we are unable to reach a settlement, the evidence will indisputably show that Tiversa and Mr. Boback did not access, take, "invade" or ever obtain the File through a LabMD computer.  Instead, as a result of a LabMD computer downloading Limewire and making its files accessible to the peer-to-peer network, the File was shared with and downloaded by individuals that connected with LabMD's File.

  > Moreover, the evidence will also show that the Plaintiffs accessed the File through a computer located in San Diego - and not the LabMD Computer - with an Internet Protocol Address of 68.107.82.250. Thus, any and all statements asserting or implying that the Plaintiffs accessed the File through a LabMD computer are demonstrably incorrect; the File had already been shared on the peer-to-peer network by LabMD at the time Tiversa and Mr. Boback came across it in February 2008.

Shaw's letter, LabMD would later learn, contained a preview of many of the lies that Boback would tell in his first deposition in the Enforcement Action on November 21, 2013.  Those lies were intended to conceal the truth and, in fact, did conceal the truth

---

[49] Daugherty Decl., para. no. 51.
[50] Daugherty Decl., para. no. 50.
[51] Daugherty Decl., para. no. 54.

16

regarding Tiversa's lies to the FTC.[52]

- LabMD learned from the whistleblower, a congressional investigation and Boback's testimony in the Enforcement Action that Tiversa allegedly created five distinct "forensic reports" on the 1718 File in April 2008, August 2008, November 2012, November 2013 and May 2014.  Tiversa failed to produce one or more of these reports in response to an FTC civil investigative demand, an FTC subpoena and a congressional subpoena.  The first forensic report exculpates LabMD.  The other forensic reports are so inconsistent and faulty as to prove that they are either falsified or completely fabricated.[53]

- The deposition of Richard E. Wallace, initially noticed by LabMD for February 2014, never occurred because Tiversa terminated Wallace shortly before his deposition when he told Boback he would not lie under oath to the federal government.[54]

- On October 14, 2014, attempted to prevent Wallace from testifying in the Enforcement Action by filing a "Notice of Information Pertinent to Richard Edward Wallace's Request for Immunity," ("Notice") wherein Tiversa tried to impugn Wallace's character and otherwise interfere with LabMD's request for Wallace to testify under immunity.[55]

- Tiversa included fabricated emails and other falsified evidence in the Notice.

### C.    Defamation

Count II of the First Amended Complaint sets forth a claim for defamation.  Defendants seek to dismiss this claim in its entirety.  Defendants' motion should be denied.  The First Amended Complaint identifies 20 "defamatory statements."  These statements provide ample context to the dispute between the parties and the malice exhibited by Defendants toward LabMD and Mr. Daugherty.  Defendants have repeatedly made false and defamatory statements about LabMD with malice.  The motion to dismiss the defamation claim against Defendants should be denied.

Defamatory Statement Nos. 1 – 4.  Tiversa, relying exclusively on *Pennsylvania* law, argues that LabMD has failed to plead Defamatory Statements Nos. 1 - 3 with sufficient

---

[52] Daugherty Decl., para. no. 64.
[53] Daugherty Decl., para. nos. 62, 79, 87, 102 and 106.
[54] Daugherty Decl., para. no. 70; FAC, para. no. 125.
[55] Daugherty Decl., para. no. 86.

specificity.  Federal courts have readily rejected such arguments.  In *Youssef v. Anvil Int'l*, 2007

U.S. Dist. LEXIS 95136 (E.D. Pa. Nov. 28, 2007), for example, the court held:

> The pleading standard for a defamation claim in federal court differs from that applied in the Pennsylvania courts. "The pleading standard governing defamation claims brought in Pennsylvania state court applying Pennsylvania law require that the complaint 'on its face, identify specifically what allegedly defamatory statements were made, and to whom they were made.'" *Rishell v. RR Donnelley & Sons Co.,* 2007 U.S. Dist. LEXIS 38325, 2007 WL 1545622, *3 (E.D. Pa.) (quoting *Moses v. McWilliams*, 379 Pa. Super. 150, 549 A.2d 950, 960 (Pa. Super. Ct. 1988) and citing *Itri v. Lewis, 281 Pa. Super. 521, 422 A.2d 591, 593 (Pa. Super. Ct. 1980))*. The pleading standard governing Youssef's defamation claim in this Court, by contrast, is set out in Federal Rule of Civil Procedure 8(a). Under this rule, "a defamation plaintiff does not have to plead the precise defamatory statements,  [14] nor must she specifically name the person who made the statements*." Tuman v. Genesis Assocs.,* 935 F. Supp. 1375, 1391 (E.D. Pa. 1996) (internal quotation omitted). See also *Leatherman v. Tarrant County,* 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993) (noting that the Federal Rules of Civil Procedure require pleading with particularity in only two instances, fraud and mistake). Therefore, Count VI may proceed.

The court in *Rishell v. RR Donnelley & Sons Co.,* 2007 U.S. Dist. LEXIS 38325, 2007 WL

1545622 (E.D. Pa. May 24, 2007) held to the same effect, going even further to state, "As long

as a defamation count 'provides sufficient notice to defendants, it states a claim.'" (citing *Joyce*

*v. Alti Am., Inc.,* No. 00-5420, 2001 U.S. Dist. LEXIS 17432, 2001 WL 1251489, at *2 (E.D. Pa.

Sept. 27, 2001) (quoting *Tuman v. Genesis Assocs*., 935 F. Supp. 1375, 1391 (E.D. Pa. 1996))).

Moreover, even if Pennsylvania's pleading rules applied, Defamatory Statement Nos. 1 -

3 are pled with sufficient specificity.  The court in *Itri v. Lewis*, 281 Pa. Super. 521, 524, 422

A.2d 591 (1980) explained that exact words are not required:

> Although it is preferable that the exact [defamatory] words be stated in the complaint, often the exact words are not known.  However, although the exact words need not be stated, the complaint must specify the substance of the spoken words; the purport of the spoken words is necessary.

LabMD does not know the exact words spoken by Tiversa to the FTC Investigators.  This is why LabMD alleged "the purport of the spoken words" by noting that Defamatory Statement Nos. 1-3 were "statements to the following effect."

Moreover, the Defendants' statements regarding the disclosure, source and spread of LabMD's File are clearly defamatory.  Each statement is false, was known by Defendants to be false, was clearly about LabMD, and resulted in harm to LabMD. Defamatory Statement Nos. 1 - 3 allege proper defamation claims.

As to Tiversa's arguments that Defamatory Statement Nos. 1 - 4 are absolutely privileged, Tiversa is wrong for a number of reasons.  First, Tiversa is confused about privileges. While the litigation privilege may be "absolute," the statements Tiversa made to the FTC Investigators do not fall within that privilege primarily because they were not made in connection with *a civil suit*.  *Post v. Mendel*, 510 Pa. 213, 223, 507 A.2d 351 (1986) (statements not "issued in the regular course of preparing for contemplated proceedings" are not protected); *Post v. Mendel*, 510 Pa. at 220 ("The instant case differs from the bulk of those heretofore decided by this Court in that the alleged defamation did not in this instance occur in the pleadings or in the actual trial or argument of a case"); *Greenberg v. Aetna Insurance Co.,* 427 Pa. 511, 514, 235 A.2d 576, 577 (1967), cert. denied, 392 U.S. 907, 88 S.Ct. 2063, 20 L.Ed.2d 1366 (1968) ("When alleged libelous or defamatory matters, or statements, or allegations and averments in pleadings or in the trial or argument of a case are pertinent, relevant and material to any issue in a civil suit, there is no civil liability for making any of them").

Moreover, the statements were not made to, in or related to *a court of competent jurisdiction*.  *Kemper v. Fort*, 219 Pa. 85, 93, 67 A. 991 (1907) ("All charges, all allegations and averments contained in regular pleadings addressed to and filed in a court of competent

jurisdiction, which are pertinent and material to the redress or relief sought, whether legally

sufficient to obtain it or not, are absolutely privileged" quoting *Wilson v. Sullivan*, 81 Ga. 238, 7

S.E. 274 (1888)).  In addition, Defamatory Statement Nos. 1 - 4 were not made to "judges,

attorneys, witnesses [or] parties in the course of or pertinent to any stage of judicial

proceedings…." *Pawlowski v. Smorto*, 588 A.2d 36, 403 Pa. Super. 71, 80 (1991).

 The litigation privilege is not truly absolute.  Here, whatever "protection" the statements

may have had (none), was lost when the statements were *republished* to others (including

Dartmouth College, Eric Johnson, the Washington Post[56]and LifeLock[57]) before and after they

were published to the FTC staff.  *Pawlowski,* 403 Pa. Super. at 81, fn. 3 ("Of course, even an

absolute privilege may be lost through overpublication, i.e., publication of the defamatory

material to unauthorized persons."); *Agriss v. Roadway Express, Inc*., 334 Pa. Super. 295, 309,

483 A.2d 456 (1984) (the judicial privilege "may be lost if the publisher exceeds the scope of his

privilege by publishing the defamation to unauthorized parties).  It is a "question of fact for the

jury whether a privilege has been abused.  *Agriss*, 334 Pa. Super. at 309, citing *Montgomery v.*

*City of Philadelphia*, 392 Pa. 178, 140 A.2d 100 (1958); *Bochetto v. Gibson,* 580 Pa. 245, 860

A.2d 67, 71 (Pa. 2004) (statement no longer privileged if later republished to an audience outside

of the proceedings).

 For the sake of argument, if there is any privilege that applies to Defamatory Statement

Nos. 1 - 4 (LabMD does not believe or assert there is), it would be the conditional or qualified

privilege that sometimes applies to statements given to law enforcement officers.  *Di'Ianni v.*

*Philadelphia*, 1987 U.S. Dist. LEXIS 11505, 1987 WL 27487 (E.D. Pa. Dec. 12, 1987) ("it is

basic hornbook law that private citizens enjoy a conditional privilege to give information to the

---

[56] OGR Report (ECF No. 63-1, pp. 64, 79 - 84).
[57] OGR Report (ECF No. 63-1, pp. 58, 61, 63 – 68, 80, 81, 86, 89 and 100).

proper authorities for the prevention or detection of crime'); *White v. Lasalle College*, 13 Phila.

429, 1985 Phila. Cty. Rptr. LEXIS 123, 1985 WL 384590 (Pa. C.P. 1985) (employer's

communications to the police were conditionally privileged); *Moore v. Cobb-Nettleton*, 889 A.2d

1262, 1268, 2005 PA Super 426, (2005) ("A conditional privilege arises when a recognized

interest of the public is involved."

Tiversa avoids any mention of the conditional privilege because the facts, as alleged here,

defeat that privilege and create a jury issue:

> A conditional privilege is abused if the plaintiff can show that the defendant acted with
> malice. *Berg v. Consolidated Freightways*, 280 Pa.Super. 495, 421 A.2d 831 (1980). The
> privilege can also be lost if the plaintiff can show that the defendant acted with
> negligence. *Banas v. Matthews International*, 348 Pa.Super. 464, 502 A.2d 637 (1985)
> This is a jury question that the jury cannot decide without proper guidance from the trial
> court.

*Bargerstock v. Wash. Greene Cmty. Action Corp.*, 397 Pa. Super. 403, 411, 580 A.2d 361

(1990); *Mansmann v. Tuman*, 970 F. Supp. 389, 1997 U.S. Dist. LEXIS 3291 (E.D. Pa. 1997)

("A qualified privilege is subject to loss by abuse; moreover, while the existence of a privilege,

and the extent of that privilege, are questions of law for the court, it is a question of fact for the

jury as to whether a qualified privilege has been abused.")

Finally, the FTC Investigators were not investigating LabMD at the time the statements

were made.[58]

Defamatory Statement Nos. 10 – 14.  Defamatory Statement Nos. 10 -14 are set forth in

the Defendants' February 10, 2015 statement to Pathology Blawg (RICO Case Statement at 9-10

Ex. E).  Although the entire statement provides the context of this ongoing dispute, it is

absolutely clear that Defendants made a false and defamatory statement about LabMD by

---

[58] The CID to The Privacy Institute does not identify LabMD by name.  Instead, it indicates that
it issued pursuant to investigations of two other companies.

asserting as "indisputable fact" that LabMD "leaked" customer information on nearly 10,000

patients.  Defendants cannot dismiss this statement on the basis that it is an opinion.  In

*Milkovich v. Lorain Burnel Co.*, 497 U.S. 1 (1990), the Supreme Court found that a statement of

opinion can be actionable if it implies knowledge of undisclosed defamatory facts.  Accordingly,

Pennsylvania Courts have held that while statements of opinion are generally considered to not

be actionable, they may constitute defamation if "reasonably understood to imply the existence

of undisclosed defamatory facts."  *Green v. Mizner*, 692 A.2d 169, 175 (Pa. Super 1997).  In

*Mizner*, the Court referred to comment (c) of the Restatement (Second) of Torts § 566 which

distinguishes between pure opinion and potentially actionable "mixed" opinion:

> A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is.  But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently.  The difference lies in the effect upon the recipient of the communication.  In the first case, the communication itself indicates to him that there is no defamatory factual statement.  In the second, it does not, and if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability.

*Mizner*, 692 A.2d at 174 (quoting Restatement (Second) of Torts § 566, comment (c)).

Moreover, in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135

S.D. 1318 (2015), the Supreme Court further examined the contours concerning facts and

opinions in the context of alleged misrepresentations in a securities offering.  The Supreme Court

reinforced the concept that different readers bring differing expectations to differing forms of

communication and the context is always the key.  *Id*. at 1327-30.  Thus, whether the speaker is

someone who holds himself out or is understood as having special knowledge of the matter

which is not available to the plaintiff" is relevant to the inquiry.  *Id*. at 1330 (quoting *Proser and*

*Kaeton* as the Law of Torts § 109 at 760-61).  For example, in *Weinstein v. Bullick*, 827 F. Supp.

1193, 1198 (E.D. Pa. 1993), the court held that a police officer's expressions of skepticism concerning a plaintiff's rape charges were not protected opinions because a reasonable viewer could infer that the officer knew more facts than were revealed in the broadcast.

In the context of the entire Pathology Blawg document, Defendants' statements could be read to imply the existence of undisclosed facts relating to whether Plaintiff "leaked" personal information about patients and thus is clearly capable of a defamatory meaning.  LabMD is a medical testing laboratory.  To state that it "leaked" (intentionally disclosed) patient information is highly damaging and defamatory.  Accordingly, LabMD's defamation claim regarding Defendants' statements in Pathology Blawg should survive and be presented to a jury.  *Mizner*, 692 A.2d at 175 (where opinion is capable of defamatory meaning the issue should be resolved by a jury).

The Other Defamatory Statements.  Defendants challenge the other defamatory statements Nos. 5-9 and 15-20 on the grounds that they do not apply to LabMD or are true or non-actionable opinions.  Their arguments do not defeat Plaintiffs' defamation claim.  In particular, Defendants continue to push their view that their statements that the 1718 File was publicly available as true.  But that is not so.  Private Files, Confidential Files or Classified Files[59] were and are *never* "publicly available" on peer-to-peer networks, as a matter of fact[60]

---

[59] "Private Files," "Confidential Files" and "Classified Files" are defined, respectively, in para. no. 27 of the FAC and further discussed in para. nos. 28-31 of the FAC.

[60] *See, e.g.*, para. nos. 18 – 21 and 24 - 30 of FAC.  Also, LabMD submitted and relied upon expert witness Adam Fisk and his expert report (marked as RX533) in the Enforcement Action. Mr. Fisk's report is attached to Daugherty Decl. as Exhibit BB and is incorporated herein by reference.  Mr. Fisk, the former Lead Engineer at LimeWire LLC, states in his report:

> Given the nature of keyword matching on Gnutella and the nature of Adaptive Search, it is my opinion that it is extremely unlikely that any typical user of the Gnutella network, including highly sophisticated users, would ever have found the "insuranceaging_6.05.071.pdf" file in question using search alone; and

and as a matter of law.[61]  The millions of copyrighted audio and visual recordings "made available" once available through Napster (a peer-to-peer service)[62] several years ago were never "publicly available" despite the fact that for many years anyone, anywhere in the world, could search for, access and download copyrighted recordings.  The 1718 File is a Private File containing personal health information (PHI).[63]  It is a felony under 42 U.S.C. § 1320d-6 for anyone to obtain or disclose PHI from a covered entity without authority.  LabMD was a covered entity.[64]  When the taking of PHI, as Tiversa did here, "is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm,", the offender shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."  42 U.S.C. § 1320d-6(b)(3).

Tiversa's unauthorized and unlawful taking of massive amounts of PHI from peer-to-peer networks (including the 1718 File), for commercial gain and otherwise, is believed to be one of the main reasons the FBI raided Tiversa's headquarters on March 1, 2016.  Given these events, it is now obvious why Tiversa is fighting so hard to have a federal court rule that the 1718 File was "publicly available."

---

In order for Tiversa to access that file, they would have had to use the browse host function described above. Mr. Boback's testimony also confirms that assessment.34 No ordinary user of the network would ever have the knowledge of how Gnutella works or the technical capability to take advantage of that knowledge to perform the types of crawls Tiversa performed. Without that capability or knowledge, it is extremely unlikely any ordinary user would ever have found the 1,718 file. The vital point is that only extremely sophisticated and custom-designed software would ever be configured in this fashion.

[61] *See* FAC, para. nos. 28 and 29.
[62] *See* https://en.wikipedia.org/wiki/Napster for background on and explanation of Napster.
[63] See FAC, para. nos. 37, 74, 75, 83, 131, 136.
[64] Daugherty Decl., para. no. 4; FAC, para. no. 1.

### D.    Tortious Interference

When Tiversa and Boback decided to exact revenge on LabMD, they knew that:

- LabMD was a small cancer-testing laboratory providing doctors with cancer-detection services.[65]

- LabMD's success depended upon the confidence of its employees, patients, providers, third party payors, insurance carriers and referral sources, that LabMD would keep patients' personal health information ("PHI") and personal identifying information ("PII") confidential.[66]

- If they, directly or indirectly, represented to any of LabMD's employees, patients, providers, third party payors, insurance carriers and referral sources that LabMD had failed to keep PHI and PII confidential, that such representations would erode if not eradicate the confidence that employees, patients, providers, third party payors, insurance carriers and referral sources had in LabMD.[67]

- False, fraudulent and defamatory representations (1) that LabMD had made patients' PII and PHI publicly available or otherwise disclosed that information on P2P networks, (2) that LabMD's 1718 File was found somewhere other than on a LabMD computer and/or (3) that LabMD's 1718 File had proliferated to multiple places on peer-to-peer networks were allegations of business misconduct that would cause harm to LabMD's reputation so as to lower it in the estimation of the employees, patients, providers, third party payors, insurance carriers, referral sources and other communities and would deter employees, patients, providers, third party payors, insurance carriers, referral sources and others from associating or dealing with it. Boback and Tiversa knew that these false representations would instill in the minds of others an impression that would adversely affect LabMD's fitness for the proper conduct of its lawful business. False representations about LabMD's abilities to keep PII and PHI confidential were particularly harmful to LabMD due to legal, ethical and other of the company's duties to maintain such information in confidence.[68]

- John Boyle was an employee of LabMD.

- LabMD had contractual employment relationships with many other employees whose names they may not have known but who have now been identified.[69]

- LabMD had relationships with hundreds of third party payors as revealed in the 1718 File Tiversa stole from LabMD[70]

---

[65] FAC, para. no. 70.
[66] FAC, para. no. 71
[67] FAC, para. no. 72.
[68] FAC, para. nos. 73, 74 and 75.
[69] FAC, para. no. 150.

- LabMD had relationships with hundreds of third party payors whose names they may not have known but who have now been identified.[71]

Tiversa and Boback also knew that LabMD had prospective contractual relationships with employees, patients, providers, third party payors, insurance carriers, referral sources and others. Tiversa and Boback did not know (and did not care) about the identities of those individuals and companies because such is the nature of *prospective* contractual relationships. *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895, 1971 Pa. LEXIS 1134 (Pa. 1971) ("But anything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability.")

The Pennsylvania Supreme Court has defined "prospective contractual relation" as "something less than a contractual right, something more than a mere hope." *Thompson Coal Co. v. Pike Coal Co*., 488 Pa. 198, 209, 412 A.2d 466 (1979). It is "a reasonable probability" that contractual relations will be realized. *Id*. (citing *Glenn v. Point Park College*, 441 Pa. 474, 480, 272 A.2d 895 (1971)). LabMD's successful history (until it was destroyed by Tiversa and Boback) shows its future contractual relations with employees, patients, providers, third party payors, insurance carriers, referral sources and others were more than a "mere hope." The facts in this case will show that those relations were probable.

Tiversa makes a general argument that LabMD has not alleged that Tiversa or Boback acted purposely to harm the prospective contractual relations but fails to support that argument with anything but rhetoric. The allegations LabMD cites above are just a few examples of such misconduct. See also, FAC, para. nos. 78 and 82, 83, 84, 90, 91, 92, 104, 114, 120, 121, 130, 133, 135 and 138 – 149.

---

[70] FAC, para. no. 151.
[71] FAC, para. no. 151.

### E.      Fraud and Negligent Misrepresentation

Tiversa makes essentially the same arguments on LabMD's claims for fraud and negligent misrepresentation that they made previously.  Thus, LabMD incorporates by reference its previous responses to those arguments found at ECF Nos. 63 and 73.

## III.     CONCLUSION

For each of the foregoing reasons, LabMD prays that the motion to dismiss the First Amended Complaint be denied.

Respectfully submitted,

Dated: April 8, 2016

**DUANE MORRIS LLP**

*/s/Kenneth M. Argentieri*
Kenneth M. Argentieri
Pa. I.D. No. 41468
DUANE MORRIS LLP
600 Grant Street, Suite 5010
Pittsburgh, PA 15219
V: 412-497-1005
F: 412-202 0669
kmargentieri@duanemorris.com

**JAMES W. HAWKINS, LLC**

*/s/ James W. Hawkins*
James W. Hawkins
*Admitted pro hac vice*
Georgia State Bar No. 338767
JAMES W. HAWKINS, LLC
11339 Musette Circle
Alpharetta, GA 30009
V: 678-697-1278
F: 678-540-4515
jhawkins@jameswhawkinsllc.com

*Attorneys for Plaintiff LabMD, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LABMD, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:15-cv-00092-MRH-MPK |
| TIVERSA HOLDING CORP. f/k/a | ) | |
| TIVERSA, INC.; ROBERT J. BOBACK; | ) | |
| M. ERIC JOHNSON; and DOES 1-10, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for parties of record electronically by CM/ECF.

*/s/ James W. Hawkins*
James W. Hawkins
*Admitted pro hac vice*
Georgia State Bar No. 338767
JAMES W. HAWKINS, LLC
11339 Musette Circle
Alpharetta, GA 30009
V: 678-697-1278
F: 678-540-4515
jhawkins@jameswhawkinsllc.com
*Attorney for Plaintiff LabMD, Inc.*