# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LABMD, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 15-92 |
| | ) | Magistrate Judge Maureen P. Kelly |
| | ) | |
| TIVERSA HOLDING CORP. *formerly* | ) | Re: ECF Nos. 414 and 419 |
| *known as* TIVERSA, INC.; ROBERT J. | ) | |
| BOBACK; M. ERIC JOHNSON; DOES | ) | |
| 1-10, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Presently before the Court is a Motion for Summary Judgment filed by Defendant Tiversa Holding Corp. ("Tiversa"), ECF No. 414, and a Motion for Summary Judgment filed by Defendant Robert J. Boback ("Boback"), ECF No. 419. Tiversa and Boback seek summary judgment as to the remaining portion of the defamation *per se* claim of Plaintiff LabMD, Inc. ("LabMD") as to Statement Nos. 13 and 16. For the reasons that follow, the Motions for Summary Judgment are granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Parties

Prior to January 2014, LabMD, a Georgia corporation, was a cancer detection facility. ECF No. 417 ¶ 2. LabMD provided uropathology and microbiology laboratory services to approximately 70 physician customers. ECF No. 433-1 ¶ 3. At all relevant times, Michael J. Daugherty ("Daugherty") was the sole shareholder, Chief Executive Officer ("CEO"), and President of LabMD. ECF No. 417 ¶ 3.

Tiversa, a Pennsylvania corporation, was a cybersecurity company. ECF No. 416 ¶ 1. From 2006 until 2016, Boback was the CEO of Tiversa. Id.

**B. The 1718 File**

Statement Nos. 13 and 16 arise out of an incident in February 2008, in which a former Tiversa employee, Richard Wallace ("Wallace"), accessed a 1,718 page PDF document containing the personal health information of approximately 9,300 patients (the "1718 File") from a LabMD employee's work computer. ECF No. 417 ¶ 3. LabMD claims that this occurred as part of a purported shakedown scheme, in which Tiversa stole the 1718 File and then attempted to sell LabMD its cybersecurity services to remedy the very breach that Tiversa allegedly created.[1] See ECF No. 125.

At that time, LabMD's billing manager had LimeWire, a peer-to-peer ("P2P") software, installed on her work computer. ECF No. 418-4 at 5; ECF No. 418-5 at 8. The purpose of most P2P networks is to search for, identify and share files stored on computers. ECF No. 417 ¶ 13. P2P software typically allows users to share files only within a single folder on their computer that has been designated for sharing. Id. ¶ 14. These programs enable one computer to search a limited number of other computers for all files that have been made available for sharing by other computer users, so long as the other computers are also using the file-sharing application and are within the radius of the search. Id. ¶ 15. The only requirements for a computer to join a P2P network are an

---

[1] This is one of numerous lawsuits filed across various jurisdictions by LabMD and/or Daugherty arising out of Tiversa's purported scheme and the Federal Trade Commission's subsequent investigation into LabMD. See United States of America ex rel. Daugherty v. Tiversa, et al., No. 14-cv-4548 (S.D.N.Y. June 24, 2014); Daugherty & LabMD v. Adams, et al., No. 17-368 (W.D. Pa. Mar. 23, 2016); LabMD v. The Privacy Institute, et al., No. 19-852 (E.D. Va. June 26, 2019); LabMD v. Tiversa, et al., No. 11-4044 (N.D. Ga. Nov. 23, 2011); LabMD v. FTC, et al., No. 13-1787 (D. D.C. Nov. 14, 2013); LabMD v. FTC, 14-810 (N.D. Ga. Mar. 20, 2014); Daugherty & LabMD v. Sheer, et al., No. 15-2034 (D.D.C. Nov. 20, 2015); LabMD & Daugherty v. Tiversa, et al., No. 17-1365 (W.D. Pa. Oct. 20, 2017); LabMD & Daugherty v. Mary Beth Buchanan, et al., 18-3790 (S.D.N.Y. Apr. 2, 2018); LabMD & Daugherty v. Mary Beth Buchanan, et al., No. 160929/2018 (N.Y. Sup. Ct. Nov. 21, 2018). LabMD also petitioned for review of the order issued by the Federal Trade Commission. See LabMD v. FTC, No. 16-16270 (11th Cir. Sept. 29, 2016).

internet connection and the P2P software, such as LimeWire. ECF No. 418-4 at 5; ECF No. 125 ¶ 14.

The 1718 File was stored in the "My Documents" folder of the computer of the LabMD billing manager, and this same folder was designated for sharing over LimeWire. ECF No. 418-4 at 5; ECF No. 418-5 at 11. As a result, LabMD admits that the billing manager "expose[d] sensitive material through her computer." ECF No. 434 ¶ 11.

Wallace testified that he downloaded the 1718 File using LimeWire and a stand-alone computer. ECF No. 418-2 at 8. He believed a different program called "EP2P" was first used to identify the file. Id.

## C. The FTC's Investigation and Enforcement Action

After the Federal Trade Commission ("FTC") became aware that LabMD patient information was available on a P2P network, it launched a non-public inquiry into LabMD's data security practices and gave notice of the inquiry to LabMD in January 2010. ECF No. 433-1 ¶ 13; see also LabMD v. FTC, 776 F.3d 1275, 1277 (11th Cir. 2015). Thereafter, on August 29, 2013, the FTC filed an enforcement action against LabMD (the "Enforcement Action"). ECF No. 433-1 ¶ 18. The FTC alleged that LabMD had violated Section 5 of the FTC Act by failing to employ reasonable and appropriate measures to prevent unauthorized access to confidential consumer communication. Id.

## D. LabMD Winds Down its Business in 2014

After the FTC initiated the Enforcement Action, Daugherty "had barely any time" to tend to LabMD's business. Id. ¶ 20. LabMD's gross revenues fell in 2013 and key employees began to leave the company. Id. According to Daugherty, LabMD's reputation suffered as a result of

the FTC Enforcement Action and a federal defamation lawsuit filed by Tiversa and Boback against LabMD and Daugherty in September 2013.[2]  Id.

LabMD stopped making lease payments by October 2013.  ECF No. 418-6 at 20.  By January 14, 2014, LabMD ceased its primary business of collecting and testing specimens.  ECF No. 418-6 at 12, 21.  LabMD's income declined to the point that Daugherty was required to lay off LabMD's remaining employees by the middle of January 2014.  ECF No. 433-1 ¶ 22.

In February 2014, Daugherty testified before the FTC that LabMD was in the process of "winding down."  ECF No. 418-19 at 6.  Based on an interview with Daugherty, *Forbes* reported that Daugherty's work was "winding down to a close" in an article titled *When the Government Closes Your Business*, published on February 1, 2014.  ECF No. 418-22 at 7.

Shortly thereafter, on March 20, 2014, LabMD claimed in a brief filed with the United States District Court for the Northern District of Georgia that the FTC's Enforcement Action had "eviscerated LabMD's business" and "ruined its reputation."  Memorandum in Support of Plaintiff's Motion for Preliminary Injunction, LabMD, Inc. v. FTC, No. 1:14-cv-810, 2014 WL 10715555 (N.D. Ga. March 20, 2014).

### E.  LabMD is a "Now-Defunct Company" and Has Not Resumed Operations

LabMD maintains its active corporation status in Georgia.  ECF No. 433-1 ¶ 23.  However, "it was effectively forced out of business by January 2014" and "now operates as an insolvent entity that simply provides records to former patients."  ECF No. 19 at 27.  In its original Complaint

---

[2] Boback and Tiversa's lawsuit was filed in this Court on September 5, 2013 at Case No. 2:13-cv-1296.  This action was later dismissed without prejudice on November 3, 2014 by United States District Judge Nora Barry Fischer.  ECF No. 84.  Boback and Tiversa subsequently reasserted their defamation claims against LabMD, Daugherty, Wallace and the Cause of Action Institute in the Court of Common Pleas of Allegheny County, Pennsylvania, No. GD-14-016497 (Pa. Ct. Com. Pl. Oct. 31, 2014).  Boback recently filed a Praecipe to Discontinue that case on March 18, 2020, indicating that it has been settled.

in this action, filed January 21, 2015, LabMD claimed that it was "decimated" and exists as "nothing more than an insolvent shell of a company." ECF No. 1 ¶ 1.

In 2016, LabMD represented to the United States Court of Appeals for the Eleventh Circuit that it is a "small, now-defunct company that, prior to being driven out of business by the FTC, conducted diagnostic testing for cancer . . . ."[3] LabMD further claimed that its "financial condition is beyond repair, and it has no prospect of resuming business."[4] Brief of Petitioner, LabMD, Inc., No. 16-16270, 2016 WL 7474626, at *6 (11th Cir. Dec. 27, 2016).

Based on the parties' briefing, the Eleventh Circuit reached the following conclusions about LabMD's status:

> LabMD ceased operations in January 2014. LabMD says its business could not bear the costs imposed by the FTC investigation and litigation, so it had to close. LabMD has essentially no assets, no revenue, and does not plan to resume business in the future. It obtained counsel pro bono because it could not afford to pay a lawyer. LabMD now has no employees, and keeps only the records required by law in a secured room, on an unplugged computer that is not connected to the Internet. LabMD has less than $5,000 cash on hand, and is subject to a $1 million judgment for terminating its lease early.

LabMD, Inc. v. Federal Trade Commission, 678 F. App'x 816, 819 (11th Cir. 2016).

More recently, following the close of briefing relative to the instant Motions for Summary Judgment, LabMD specifically referred this Court to the Eleventh Circuit's conclusions identified above as evidence that LabMD cannot pay any monetary sanctions imposed by this Court. ECF No. 442 at 3. As of October 4, 2020, LabMD described that its financial condition has only deteriorated further, and "[t]oday, LabMD owns no real estate, stocks, bonds or other securities

---

[3] LabMD's Time Sensitive Motion to Stay Enforcement of the Commission's Final Order Pending Appeal, and for a Temporary Stay While the Court Considers the Motion, No. 16-16270 (11th Cir. Oct. 7, 2016).

[4] In support of this assertion, LabMD cites to a sworn declaration from Daugherty dated August 30, 2016, which asserts that "LabMD does not expect ever to resume operations and does not see how that could ever happen . . . ." Appendix to Brief of Petitioner, LabMD, Inc., No. 16-16270 (11th Cir. Jan. 3, 2017), filed at LabMD's Appendix to Brief, Vol. II, Doc. 359.

and has no cash on hand." Id.  In addition, LabMD "owns no medical equipment or physical assets, has no ownership in any other entities and is no longer collecting on accounts receivable." Id.

Daugherty testified in his deposition in this case, given on June 19, 2019, that since winding down its business in 2014, LabMD has not pursued any investors nor taken any steps to resume operations.  ECF No. 418-6 at 139:4-8; 193 at 9-10.  LabMD has not attempted to renew or retain its licenses, doctors, insurance or real estate leases to become a functioning business or testing facility.  ECF No. 418-6 at 21:8-20, 24:25-25:7, 27:5-15.  It has not made a profit since 2013, and it no longer collects on accounts receivable.  ECF No. 416 ¶ 47; ECF No. 418-6 at 37:20-25, 38:1-4; ECF No. 442-1 ¶ 10.  LabMD currently has no revenue, real estate, stocks, bonds, or other securities, and has no cash on hand.  ECF No. 442-1 ¶¶ 5-7.  LabMD sold the medical equipment it needed to run its laboratory in 2014, and it does not own any medical equipment or other physical assets.  ECF No. 442-1 ¶ 8; ECF No. 418-6 at 38:5-10; ECF No. 416-6 at 31.[5]

On September 6, 2018, Daugherty registered, and now operates, a new corporation in Virginia named LabMD2, Inc. ("LabMD2").[6]  ECF No. 418-6 at 31:23-32:8, 45:11-12.  LabMD2 is a distinct company from the original LabMD.  Id.

---

[5] Although LabMD sold or donated all of its medical equipment by 2014 and no longer owns medical equipment or physical assets, Daugherty claims in his declaration that LabMD somehow continued to incur debt for the storage of its assets in Daugherty's house and garage.  ECF No. 433-1 ¶ 22.  Daugherty states that he charged LabMD $4,000 a month in rent for sixty-eight (68) months to store its former medical equipment in his house and garage, accruing debt of $272,000 on behalf of LabMD by September 2019.  Id.

[6] Business records are available on the Commonwealth of Virginia State Corporation Commission website, https://cis.scc.virginia.gov (last visited March 20, 2020).  See also ECF No. 416 ¶ 63.

**F. The Alleged Defamatory Statements**

**1. Statement No. 13**

Approximately one year after LabMD closed its lab, on February 10, 2015, *The Pathology Blawg* published the following statement on its website ("Statement No. 13"):

> LabMD lawsuit—The claims are baseless and completely unsubstantiated . . . . even in the complaint itself. This appears to be yet another attempt by Daugherty to distract people from the INDISPUTABLE FACT that LabMD and Michael Daugherty leaked customer information on nearly 10,000 patients.

ECF No. 417 ¶ 7.

Statement No. 13 is an excerpt from a four-page statement that Boback submitted in response to a request for comment on this lawsuit from the author of *The Pathology Blawg*.[7] *The Pathology Blawg* is a website that "mainly deals with medicolegal issues in pathology and laboratory medicine." ECF No. 421-2. In his February 10, 2015 submission, Boback continued in the paragraph after Statement No. 13.

> To my understanding from the deposition transcripts, LabMD had a policy against installing file sharing software. An employee at LabMD violated that policy, which resulted in the exposure of nearly 10,000 patients private information. This clearly demonstrates that LabMD DID NOT adequately protect their patient's PHI/PII, which is all that the FTC needs to demonstrate. Case closed. The rest of this is just a desperate attempt to distract everyone from that INDISPUTABLE FACT.

ECF No. 18-5 at 5.

In a declaration, Daugherty claims that Statement No. 13 "will make it even more difficult for LabMD to return to business as a cancer detection laboratory" because LabMD must employ a certified uropathologist as director of its laboratory. ECF No. 433-1 ¶ 28. Daugherty claims that, because this statement was directed to these medical professionals, "LabMD will have to spend

---

[7] Statement Nos. 13 and 16 were both made after this lawsuit was initiated. LabMD added its defamation *per se* claim arising out of these Statements in its First Amended Complaint on February 12, 2016. ECF No. 125.

even more time and money attempting to rehabilitate its reputation so that it can attract qualified uropathologists." Id.

### 2. Statement No. 16

On December 9, 2015, almost two years after LabMD ceased operations, *The Wall Street Journal* published the following statement ("Statement No. 16"):

> LabMD's CEO Michael Daugherty admits that a LabMD employee improperly installed LimeWire file-sharing software on a company computer. Doing so made confidential patient information publicly available over the Internet.

ECF No. 417 ¶ 10.

Statement No. 16. is a portion of a letter to the editor of the *The Wall Street Journal* written by Boback. Boback precedes Statement No. 16 with the sentence: "LabMD, a Georgia-based cancer screening company, admits that its own employee mistakenly exposed the confidential medical records of nearly 10,000 individuals onto the Internet." ECF No. 433-16 at 3.

Boback's letter is framed in response to an op-ed by LabMD's counsel Dan Epstein titled *Hounded Out of Business by Regulators* ("Epstein's Editorial"), which was published in *The Wall Street Journal* on November 20, 2015. Id.; ECF No. 417 ¶ 8. Epstein's Editorial discusses Tiversa's download of the 1718 File in 2009, the FTC enforcement action against LabMD, and the fact that the "six-year federal investigation forced LabMD to close last year." Id. ¶ 9.

In a declaration dated September 23, 2019, Daugherty claims that Statement No. 16 will make it even more difficult for LabMD to return to business as a cancer detection laboratory. ECF No. 433-1 ¶ 29. Daugherty asserts that investors read *The Wall Street Journal*, and this statement was targeted to investors and the business community. Id. He notes that this article remains available online to subscribers of *The Wall Street Journal*. Id.

### G. Other Public Discourse

In 2013, Daugherty wrote and published a book titled *The Devil Inside the Beltway*. ECF No. 417 ¶ 5. In his book, Daugherty discusses Tiversa's download of the 1718 File, P2P software, and LabMD's dispute with the FTC. Id. ¶ 6. He further describes inadvertent file sharing over P2P networks as "LimeWire leaks" and states that "LimeWire was an unruly beast that could also cause [the billing manager] to expose her workstation files without her even knowing." ECF No. 418-4 at 5-8. Daugherty continues to promote *The Devil Inside the Beltway*, including through his website and linked social media accounts. ECF No. 416 ¶ 27. He believes that his book has helped to restore LabMD's reputation. ECF No. 433-1 ¶ 24.

At a July 24, 2014 Congressional hearing regarding the FTC's Enforcement Action, then-ranking Member Elijah Cummings made a statement that "Mr. Daugherty admits that more than 900 files on his billing manager's computer were accessible for public sharing and downloading, which is a major security breach." ECF No. 418-11 at 2.

Daugherty was interviewed for an article published in *Bloomberg* on August 25, 2016, which was titled: *A Leak Wounded This Company. Fighting the Feds Finished it Off*. ECF No. 418-9 at 3-4. Daugherty shared the *Bloomberg* story on his Twitter and Facebook accounts. ECF No. 416 ¶ 14. He has over 11,000 Twitter followers and over 2,400 followers on his public Facebook page. Id. ¶ 30; ECF No. 418-6 at 53.

In his blog, Daugherty discussed LabMD's fight with the FTC and explained that the company "is challenging whether a minor data leak of dubious origins that led to no consumer harm is subject to the FTC's authority." ECF No. 416 ¶ 13; ECF No. 418-7; ECF No. 418-8.

The FTC held that "the record does not show that Tiversa, whatever its motives, unlawfully obtained the 1718 file; LabMD made the file freely available for public viewing through

LimeWire." ECF No. 416 ¶ 22; ECF No. 418-12 at 32. The FTC also found that it was the "installation of file-sharing software" that exposed the 1718 File on a P2P network that led "to the unauthorized disclosure of the information." ECF No. 416 ¶ 23; ECF No. 418-12 at 2.

In a declaration, Boback asserts that he believed Statement Nos. 13 and 16 to be true when he made them. ECF No. 418-1 ¶ 17. He asserts that he routinely took the position that files in a shared folder on LimeWire are considered publicly available, and that he believed that a person or company that placed documents in a shared folder was responsible for leaking the documents. Id. ¶¶ 11, 14. In a 2011 filing in LabMD, Inc. v. Tiversa, No. 11-cv-4044 (N.D. Ga. Nov. 30, 2011) (the "Georgia Action"), Tiversa argued that it accessed "a file publicly available on a P2P network." ECF No. 418-25 at 3.

Prior to making Statement Nos. 13 and 16 in 2015, Boback claims that he considered LabMD's public statements, including those in *The Devil Inside the Beltway*, Daugherty's FTC testimony in which he admitted that the 1718 File was found on a P2P network and that the billing manager computer's had LimeWire, and Wallace's FTC testimony that he used a stand-alone computer to download the 1718 File. ECF No. 416 ¶ 16. He further claims that he observed the July 24, 2015 Congressional hearing, discussed above, reviewed case law cited in support of Tiversa's briefing in the Georgia Action, and reviewed a *Computer World* article titled *Don't Expect Data on P2P Networks to be Private, Judge Rules*. ECF No. 418-1 ¶¶ 7, 10 and 13.

### H. Procedural History

LabMD commenced this litigation on January 21, 2015. ECF No. 1. Following the disposition of two Motions to Dismiss that were granted in part and denied in part, ECF No. 115, on February 12, 2016, LabMD filed a First Amended Complaint. ECF No. 125. Another Motion to Dismiss was filed. ECF No. 137. On October 7, 2016, this Court issued a Report and

Recommendation recommending that the Motion to Dismiss be granted as to Count II (defamation *per se*, as to Defamatory Statements Nos. 1-12, 14-15 and 17-20), Count III (tortious interference with existing and prospective business relationships), Count IV (fraud), Count V (negligent misrepresentation) and Count VI (civil conspiracy). ECF No. 166. It was further recommended that the Motion to Dismiss be denied as to Count II, the defamation *per se* claim, only as to Defamatory Statements Nos. 13 and 16. Id. The Report and Recommendation was adopted by District Judge Mark R. Hornak. ECF No. 185.[8]

Following disposition of the Motions to Dismiss, the only remaining claim is a portion of LabMD's defamation *per se* claim as to Statement Nos. 13 and 16.

> 133. The following statements published by Tiversa and Boback in their February 10, 2015 statement to "The Pathology Blawg" are false and defamatory, were known by Boback and Tiversa to be false and defamatory, were understood by recipients of the statements to apply to LabMD, were intended to harm LabMD and did, in fact, cause special harm [to] LabMD: . . .
>
> - LabMD lawsuit — The claims are baseless and completely unsubstantiated . . . . even in the complaint itself. This appears to be another attempt by Daugherty to distract people from the INDISPUTABLE FACT that LabMD and Michael Daugherty leaked customer information on nearly 10,000 patients. (Defamatory Statement No. 13).

ECF No. 125 ¶ 133 (internal citations omitted).

> 135. The following statements made by Boback and Tiversa in a letter to the editor of the Wall Street Journal, published in the December 9, 2015 edition of the Journal, are false and defamatory, were known by Boback and Tiversa to be false and defamatory, were understood by recipients of the statements to apply to LabMD, were intended to harm LabMD and did, in fact, cause special harm [to] LabMD: . . .
>
> - LabMD's CEO Michael Daugherty admits that a LabMD employee improperly installed LimeWire file-sharing software on a company computer. Doing so made confidential patient information publicly available over the Internet. (Defamatory Statement No. 16).

Id. ¶ 135.

---

[8] All parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings. ECF No. 249.

The parties conducted extensive discovery. Discovery closed on July 1, 2019. ECF Nos. 349 and 406.

On August 23, 2019, Defendants Tiversa and Boback filed the instant Motions for Summary Judgment and Briefs in Support. ECF Nos. 414, 415, 419 and 420. The parties submitted a Joint Statement of Undisputed Facts. ECF No. 417. Tiversa additionally filed a Concise Statement of Material Facts and Appendix, ECF Nos. 416 and 418, in which Boback joined. Boback filed a Supplemental Appendix. ECF No. 421.

On September 23, 2019, LabMD filed Briefs in Opposition to the Motions for Summary Judgment. ECF Nos. 431 and 432. LabMD filed a Response to Defendants' Concise Statement of Material Facts,[9] ECF No. 434, an Appendix, ECF No. 433, and an Offer of Proof, ECF No. 435.[10]

Boback and Tiversa submitted reply briefs on October 7, 2019. ECF Nos. 446 and 450. Tiversa additionally submitted a reply to LabMD's Response to Tiversa's Concise Statement of Material Facts. ECF No. 447.

---

[9] LabMD's submission fails to comply with Local Civil Rule 56(C)(1)(c), which specifically requires the party opposing summary judgment in its Responsive Concise Statement of Material Facts to set forth "in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment." As a result of this omission, the Court has incorporated facts cited in LabMD's Brief in Opposition where appropriate citations to the record have been provided.

[10] On August 16, 2019, the Court issued a Memorandum Opinion and Order, ECF No. 413, granting Tiversa and Boback's Motion for Sanctions, ECF Nos. 393 and 402, against LabMD for its willful disregard of this Court's discovery orders. ECF No. 413. As one of the five sanctions the Court imposed, we expressly precluded LabMD from relying upon the deposition testimony of witnesses Boback, Wallace, Keith Tagliaferri, Jeromy Dean, Sean Ways and Jason Shuck, "including in responding to any motion for summary judgment and for any purpose whatsoever in the trial of this case." Id. at 37. In addition to the materials noted above, LabMD submitted an "Offer of Proof" containing additional argument and deposition excerpts from precluded testimony that LabMD claims it "would cite" if permitted to do so. ECF No. 435 at 1. Because the Court clearly ordered that this evidence would not to be considered in resolving Defendants' Motions for Summary Judgment, the Court will not consider LabMD's "Offer of Proof." Tiversa has filed a Motion to Preclude and/or Strike and for Sanctions with respect to the Offer of Proof and LabMD's expert declaration, ECF No. 445, which the Court has addressed in a separate ruling. ECF No. 463.

LabMD filed sur-replies on October 21, 2019. ECF Nos. 454 and 455.

The Motions for Summary Judgment are now ripe for consideration.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 322; see also Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)) (internal quotations omitted).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Matreale v. N.J. Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

## III.   DISCUSSION

LabMD's sole remaining claim in this action is a portion of its defamation *per se* claim, based on Statement Nos. 13 and 16. "Defamation, of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation by false and malicious statements." Joseph v. Scranton Times L.P., 959 A.2d 322, 334 (Pa. Super. 2008). The elements of a Pennsylvania defamation claim are codified by statute. In order to successfully establish a claim for defamation, the plaintiff has the burden of proving:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa. C.S.A. § 8343(a).

In the pending Motions for Summary Judgment, Tiversa and Boback argue that the Court should enter summary judgment against LabMD because LabMD cannot establish the requisite

elements of its defamation *per se* claim.  At the outset, the Court looks to whether LabMD can prove the requisite element of harm from the publication of Statements Nos. 13 and 16.

As to this element, Tiversa and Boback argue that LabMD cannot prove that Statement Nos. 13 and 16 caused it harm, because it was nonoperational at the time Boback made the Statements.[11]

Under Pennsylvania law, there are two categories of compensatory damages relevant to a defamation claim: "actual" and "presumed" damages.  Sprague v. American Bar Ass'n, 276 F. Supp. 2d 365, 368 (E.D. Pa. 2003).  Because the Court agrees there is not sufficient evidence to establish actual or presumed damages, as discussed below, summary judgment will be granted in favor of Defendants Tiversa and Boback.

### A. Actual Damages

In order to establish actual damages, plaintiff must show competent proof of harm.  Id. There are two types of actual damages: "general" and "special."  Id.  "General" damages are those that "typically flow from defamation, such as 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.'"  Id. (quoting Marcone v. Penthouse Int'l Magazine, 754 F.2d 1072, 1079 (3d Cir. 1985)) (internal quotations omitted).

"Special" actual damages are economic or pecuniary losses caused by the defamation.  Id. "Special damages are 'actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade of particular customers, or actual loss due to refusal of credit by specific persons, all expressed in figures.'"

---

[11] In addition to moving for summary judgment on this basis, Defendants argue that summary judgment is also proper because (1) the Statements are true; (2) the Statements are not defamation *per se*, because LabMD was out of business at the time of the Statements; (3) LabMD has not suffered damages as a result of the Statements; and (4) LabMD does not prove Boback acted with "actual malice," which it is required to do because LabMD is a limited public purpose figure, ECF Nos. 415 and 420.  Because the Court finds, construing the evidence in the light most favorable to LabMD, that LabMD cannot prove harm, it is not necessary to reach a decision on the other grounds.

Beverly Enterprises v. Trump, 182 F.3d 183, 188 (3d Cir. 1999) (quoting Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 246 F. Supp. 419, 422 (W.D. Pa. 1965), *rev'd on other grounds*, 367 F.2d 625 (3d Cir. 1966)).[12]

In a defamation libel action, as here, plaintiff is not required to prove special damages.[13] Joseph v. Scranton Times L.P., 129 A.3d 404, 429 n. 10 (Pa. 2015) ("[P]roof of special harm, *i.e.*, monetary damages, is not a prerequisite to recovery in a defamation libel action."); see also Agriss v. Roadway Express, Inc., 483 A.2d 456, 474 (Pa. Super. 1984) ("[A] plaintiff in libel in Pennsylvania need not prove special damages or harm in order to recover; he may recover for any injury done his reputation and for any other injury of which libel is the legal cause.").[14]

In their Motions for Summary Judgment, Tiversa and Boback argue that LabMD cannot prove damages, because LabMD was already out of business well before Boback made Statement Nos. 13 and 16. ECF No. 415 at 20-23. Because LabMD was non-operational and unprofitable

---

[12] In Joseph v. Scranton Times, L.P., the Superior Court of Pennsylvania opined that the term "special harm" as used in Pennsylvania's defamation statute, 42 Pa. C.S.A. § 8343, has a different meaning. Joseph v. Scranton Times, L.P., 89 A.3d 251, 261 (Pa. Super. 2014), *rev'd in part on other grounds*, 105 A.3d 655 (Pa. 2014). With respect to the defamation statute, the term "special harm" has been interpreted to mean "general damages." Id. The reason for this apparent contradiction is that the term "special harm" has different meanings in the statute and the Restatement. Id.; see also John B. Spitzer, Pennsylvania Defamation Litigation: the Hepps Revolution, 91 Pa. Bar Assoc. Quarterly 21, 23 ("Pennsylvania caselaw has interpreted that statutory phrase, 'special harm,' to mean general damages, which are proven upon a showing of actual harm. Actual harm includes impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.").

[13] Libel is a "method of defamation expressed by print, writing, pictures, or signs." Agriss, 483 A.2d at 469. Although the parties do not address the type of defamation at issue, the Court analyzes LabMD's claim as defamation libel because Statement Nos. 13 and 16 were written.

[14] Defendants also argue that Statements Nos. 13 and 16 do not qualify as defamation *per se*. Specifically, Defendants argue that, in order for a statement regarding a business to be defamation *per se*, it must relate to business misconduct. Because LabMD was out of business at the time, they contend, the Statements do not qualify as defamation *per se*. Based on the Court's review, if a statement is considered defamation *per se*, a plaintiff is not required to prove special harm, i.e., pecuniary loss. See Bakare v. Pinnacle Health Hospitals, Inc., 469 F. Supp. 2d 272, 298 (M.D. Pa. 2006) (citing Franklin Prescriptions, Inc. v. N.Y. Times Co., 424 F.3d 336, 343 (3d Cir. 2005)). While courts have held this distinction is relevant in slander cases, however, libel actions do not require proof of pecuniary loss. Therefore, this distinction does not appear to be relevant to the determination of Defendants' Motions for Summary Judgment. Defendants do not cite authority for the proposition that LabMD's claim must be dismissed if it is does not meet the legal standard for defamation *per se* or address whether the Statements are capable of defamatory meaning if LabMD is no longer in business.

long before Statement Nos. 13 and 16, Defendants argue that LabMD cannot recover damages for reputational harm. Id. at 22. Defendants further contend that Daugherty was unable to identify any specific harm attributable to the Statements at his deposition, and at the same time, LabMD has attributed its damages to the FTC's investigation and Defendants' defamation lawsuit against LabMD and Daugherty. Id. at 21-23. Moreover, Defendants argue that LabMD cannot solely rely on the testimony of its own employee to prove harm to LabMD's reputation, because reputation is measured through the perception of others. Id. at 21 (citing Synygy v. ZS Assoc., Inc., 110 F. Supp. 3d 602, 616 (E.D. Pa. 2015); Pennoyer v. Marriott Hotel Servs., Inc., 324 F. Supp. 2d 614, 619 (E.D. Pa. 2004)).

In its Brief in Opposition, LabMD argues that it still maintains its active corporation status and is "poised to become a viable company." ECF No. 431 at 17. LabMD asserts that it continues to do some small, not-for-profit "business" in the form of maintaining and providing medical records as required under state and federal law. Id. at 18. LabMD contends that Daugherty wants to rehabilitate LabMD's reputation, and that LabMD has incurred nearly $600,000 in special damages, including attorneys' fees, accounting fees, website expenses, telephone, facsimile, postage, bank charges, dues, subscriptions, utilities, insurance, publication costs, travel expenses and fees for speaking engagements in order to restore its "good name." Id. at 21-22. LabMD does not claim general damages for injury to its reputation. Id. at 21. It argues, however, that "Tiversa and Boback's defamatory statements have prevented LabMD from becoming a viable company by destroying LabMD's good name and stellar reputation."[15] Id. at 3.

---

[15] LabMD's assertions that it is "poised to become a viable business" and that Statement Nos. 13 and 16 "destroy[ed] LabMD's good name and stellar reputation" do not find support in the record. ECF No. 431 at 3, 17. LabMD does not cite any record evidence to arguably support these statements and, as discussed above, LabMD has not taken any steps to resume business. With respect to its reputation, LabMD asserted by March 2014 that the FTC investigation had "eviscerated LabMD's business" and "ruined its reputation." See Memorandum in Support of Plaintiff's Motion for Preliminary Injunction, LabMD, Inc. v. FTC, No. 1:14-cv-810, 2014 WL 1075555 (N.D. Ga. March 20, 2014). Daugherty claims in his declaration filed in support of LabMD's Brief in Opposition that the

Upon review, the Court finds, construing the evidence in the light most favorable to LabMD, that LabMD fails to proffer the requisite evidence of actual damages. LabMD does not claim general damages for harm to its business reputation, and there is no evidence to support such a finding. ECF No. 431 at 21-22. LabMD has repeatedly, and publicly, represented that it became non-operational and ceased operation over one year before the first of Statement Nos. 13 and 16. LabMD cannot proffer evidence that others were deterred from conducting business with it, or that it lost profits as a result of Statement Nos. 13 and 16, because LabMD previously ceased operations and it has not attempted to resume business.

Tiversa correctly points out that Daugherty, during his recent deposition in this case, could not provide responsive answers to specific questions as to what evidence he had that Statement Nos. 13 and 16 caused damages to LabMD. ECF No. 418-6 at 71-73.

LabMD also fails to support its claim of special damages. To the extent LabMD cites Daugherty's declaration for the proposition that it has incurred nearly $600,000 in debt to restore its good name, this evidence is insufficient to establish special damages. First, remediation costs alone cannot serve as proof of special damages. Synygy, 110 F. Supp. 3d at 618. "[S]pecial harm must result from the conduct of *a person other than the defamer or the one defamed* and must be legally caused by the defamation." Id. (citing Restatement (Second) Torts § 575 cmt. b). Thus, LabMD's "own expenditures" that it incurred to address its perception of harm "are not sufficient to raise a material question of fact as to whether it suffered the requisite special damages." Id.[16]

---

Enforcement Action and Defendants' defamation lawsuit harmed its reputation and led to LabMD going out of business significantly before Boback made the Statements. See ECF No. 433-1 ¶ 20, 22.

[16] LabMD argues that it incurred nearly $600,000 in damages in 2015 and 2016, citing to Daugherty's declaration in support of its assertion. Separately, in the introductory section of its Brief in Opposition, LabMD claims that it has incurred nearly $1.5 million in expenses to date in order to "mitigate the harm it has suffered." ECF No. 431 at 3. This assertion lacks support in the record, because LabMD does not cite evidence in support of this claim. Regardless of the specific amount, however, LabMD's purported mitigation costs do not raise a question of fact as to special damages for the reasons discussed above.

Moreover, it is not enough for LabMD to claim that it incurred damages; it must establish a causal connection between the alleged defamation, in this case Statement Nos. 13 and 16, and the actual injuries. See Joseph, 129 A.3d at 428-29 ("[I]t is incumbent upon such plaintiffs to establish a causal connection between the negligently published falsehood and the actual injuries which they have suffered"); see also Agriss, 483 A.2d at 474 (noting that plaintiff in libel action may recover for injury to reputation and "any other injury *of which libel is the legal cause*") (emphasis added). LabMD fails to do so. It is undisputed that LabMD had ceased operations by January 2014. Statement No. 13 was not published in *The Pathology Blawg* until over a year later, on February 10, 2015. Statement No. 16 was not published until December 9, 2015 in *The Wall Street Journal*, almost two years after LabMD was out of business. As such, based on the evidence construed in the light most favorable to LabMD, LabMD fails to establish the requisite causal connection between the two alleged defamatory statements and its actual injuries that it suffered prior to the Statements. Given that LabMD does not prove harm to its business reputation caused by Statement Nos. 13 and 16, it also cannot show that the Statements caused LabMD to incur costs to restore its reputation.

In addition, although LabMD cites Daugherty's declaration for the proposition that it incurred almost $600,000 in debt because of Statement Nos. 13 and 16, this assertion is not supported by Daugherty's declaration. See ECF No. 431 at 5; ECF No. 433-1 ¶ 26. In his declaration, Daugherty does not claim that these costs occurred as a result of Statement Nos. 13 and 16. To the contrary, Daugherty makes clear that his efforts to restore LabMD's reputation predate the Statements, and that certain costs arise out of those ongoing efforts. Daugherty cites, for example, costs arising out of his publication and promotion of *The Devil Inside the Beltway*, which was published in 2013. See ECF No. 433-1 ¶¶ 24-26. Further, this list includes various

costs that are not plausibly related to harm caused by libel, including costs for utilities, subscriptions, and dues to unspecified organizations. Id. ¶ 26.

Simply put, the record, construed in the light most favorable to LabMD as the non-moving party, is devoid of evidence that LabMD suffered damages as the result of the publication of Statement Nos. 13 and 16. Accordingly, the record does not support a finding of actual damages.

## B. Presumed Damages

"'Presumed damages' are those that are expected to result from defamation; they require no proof, but instead, as reflected in their name, are presumed under the law." Sprague, 276 F. Supp. 2d at 368. Thus, presumed damages "allow a defamation plaintiff to recover compensatory damages without proving the defamatory statement caused actual harm." Franklin Prescriptions, Inc. v. N.Y. Times Co., 424 F.3d 336, 341 (3d Cir. 2005). The rationale for allowing presumed damages in appropriate cases is "that it may be unfair to require proof of actual harm to reputation because reputational injury is difficult to prove and measure." Id. at 441.[17]

To establish a right to presumed damages, LabMD must prove by clear and convincing evidence that Boback acted with actual malice, "i.e., with knowledge that [the Statements] were false or with reckless disregard of whether [they] were false or not." Lewis v. Philadelphia Newspapers, Inc., 833 A.2d 185, 192 (Pa. Super. 2003) (quoting Curran v. Phila. Newspapers, Inc., 546 A.2d 639, 642 (Pa. Super. 1988)) (internal quotations omitted); Beverly Enterprises, 182 F.3d at 188 n. 2; Joseph, 129 A.3d at 432.

---

[17] Presumed damages are compensatory damages, although they do not require competent proof of harm. Accordingly, courts have reduced such awards where it is clear that the award is serving a punitive, as opposed to compensatory, function. See, e.g., Republic Tobacco Co. v. N.A. Trading Co., Inc., 381 F.3d 717, 725 (7th Cir. 2004) ("Presumed damages serve a compensatory function—when such an award is given in a substantial amount to a party who has not demonstrated evidence of concrete loss, it becomes questionable whether the award is serving a different purpose."). For the reasons discussed above, the Court concludes that LabMD cannot satisfy the requisite fault standard to establish presumed damages. Nevertheless, given that LabMD had been non-operational for over a year at the time of Statement No. 13 and almost two years at the time of Statement No. 16, LabMD has not established a basis from which a jury could presume damages to LabMD's business reputation.

"Because 'actual malice' is a fault standard, it is not shown by the falsity of the statement in and of itself." Lewis, 833 A.2d at 192. "[T]he standard is a subjective one—there must be sufficient evidence that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" Joseph, 129 A.3d at 437 (quoting Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 (1989)) (internal quotations omitted). This state of mind may be proven through circumstantial evidence. Id. "[E]vidence of ill will or a defendant's desire to harm the plaintiff's reputation, although probative of the defendant's state of mind, without more, does not establish 'actual malice.'" Lewis, 833 A.2d at 192.

> "[T]he requirement that the plaintiff be able to show actual malice by clear and convincing evidence is initially a matter of law." Tucker [v. Philadelphia Daily News, 848 A.2d 113, 130 (Pa. 2004).] "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." Milkovich [v. Lorain Journal Co., 497 U.S. 1, 17 (1990).] This rule is premised on "the unique character of the interest protected by the actual malice standard." Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685-86, 109 S.Ct. 2678, 2695, 105 L.E.2d 562 (1989). More fundamentally, the rule is derived from the recognition that "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" Bose Corp. [v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 (1984).]

Joseph, 129 A.3d at 436.

In the Motions for Summary Judgment, in addition to arguing that LabMD cannot prove damages because it was out of business, Defendants contend that Statement Nos. 13 and 16 are both true.[18] ECF No. 415 at 13-18. Therefore, the Statements are not defamatory, they argue, and

---

[18] "Truth is an affirmative defense under Pennsylvania law." Mallory v. S&S Publishers, 260 F. Supp. 3d 453, 460 (E.D. Pa. 2017) (citing Pa. C.S.A. § 8343(b)(1)). "A defendant may avoid liability if it shows that its statements were 'substantially true.'" Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014).

LabMD clearly cannot satisfy the heightened burden of proving that Boback made the Statements with actual malice.[19] Id. at 26-30.

With respect to Statement No. 16, Defendants argue that the undisputed facts confirm the "publicly available" nature of the 1718 File. In particular, LabMD has admitted that 1718 File was stored in a folder that had been designated for sharing with other LimeWire users; those files had been made available for sharing with other computer users; and a LabMD employee "expose[d] sensitive material through her computer." Id. at 10-11. Defendants assert that Boback's statement the 1718 File was "publicly available" is consistent with various courts' holdings regarding files stored on P2P networks and the 1718 File, specifically. Id. at 8-10. Moreover, they argue, Daugherty endorsed other publications using the same, or similar, language regarding the 1718 File. Id. at 11.[20]

With respect to Statement No. 13, Defendants argue that the 1718 File was "leaked" when LabMD's employee made the file publicly available. Id. at 6, 13. Defendants point to similar language used by the United States Court of Appeals for the D.C. Circuit and the FTC regarding the 1718 File, which have characterized the incident as an "undisputed data-security breach" and the "unauthorized disclosure" of the file. They further argue that Daugherty has used or promoted similar language regarding the 1718 File. Id. at 16.

---

[19] Defendants argue that LabMD must prove Boback acted with actual malice because LabMD is a limited purpose public figure. LabMD disputes that it is a limited purpose public figure, but it concedes that actual malice is nevertheless required to establish presumed damages. See ECF No. 431 at 20, 24. Because the Court addresses this issue in the context of presumed damages, it is not necessary to resolve the separate question of whether LabMD is a limited purpose public figure. Moreover, because Defendants specifically address damages and whether Boback acted with actual malice, the Court disagrees with LabMD's contention that Defendants have failed to address LabMD's argument in support of presumed damages.

[20] LabMD mistakenly argues that this Court's ruling at the initial motion to dismiss stage of this case as to the sufficiency of pleadings of the defamation claim as to Statement No. 16 somehow created the law of the case as to the meaning of "publicly available." ECF No. 431 at 12. This argument is wrong and misconstrues this Court's prior ruling as to initial pleading.

In its Brief in Opposition, LabMD argues that there are questions of fact regarding Defendants' actual malice, which preclude summary judgment. ECF No. 431 at 22. LabMD argues that Daugherty's prior statements are not relevant. Id. at 16-17. Before receiving a phone call from Wallace in 2017, LabMD argues, Daugherty had no reason to believe that Wallace used EP2P, a proprietary law enforcement software, to find the 1718 File, and therefore his prior statements were based on a "faulty premise." Id. LabMD asserts that the possible use of EP2P raises questions of fact as to whether the 1718 File was actually "publicly available" or "leaked." In addition, LabMD argues that the presence of LimeWire on a computer does not entitle Tiversa to view confidential medical information and does not render the 1718 File "publicly available." Id. at 23.

With respect to Statement No. 13, LabMD argues the claim that it "leaked" the 1718 File "is exceedingly deceptive, if not false." Id. at 16. LabMD argues that, in making this Statement, Boback failed to provide relevant context, such as: (1) Tiversa took the 1718 File without authority or permission; (2) Tiversa used proprietary law enforcement surveillance software, EP2P, to search for and locate the 1718 File; and (3) no one other than Tiversa ever searched for or found the 1718 File. Id. To accept Boback's framing, it argues, would mean that any item available to others has been "leaked," even if it would be extremely difficult to obtain the item. Id.

As to Boback's state of mind, LabMD argues that actual malice can be inferred because Defendants previously misrepresented the circumstances surrounding Wallace's acquisition of the 1718 File, including false statements that the file had "spread" to computers of bad actors. LabMD contends that there are questions of fact as to whether Tiversa and Boback "had doubts" about the truth of the Statements, because there is no evidence that anyone other than Tiversa searched for or found the 1718 File. Id. at 22-23. LabMD also points to emails that a Tiversa board member,

Joel Adams ("Adams"), exchanged with Boback in 2015. In his emails, Adams expressed anger at LabMD and stated "[w]e'll get those pricks" and "[c]losing in on mr. D." Id. at 9-10. LabMD further refers to several incidents in which Boback made negative comments about Daugherty to individuals associated with events at which Daugherty planned to speak. Id. at 10-11.

Upon review of the record, the Court concludes that LabMD cannot satisfy its heightened burden to prove by clear and convincing evidence that Boback made Statement Nos. 13 and 16 with actual malice. It is undisputed that the 1718 File was designated for sharing over a P2P network and, as a result, a LabMD employee "expose[d] sensitive material through her computer." Although LabMD disputes whether this renders the 1718 File "publicly available" or "leaked" within the common meaning of those words, the record does not establish that *Boback* believed, or had probable knowledge, that his characterizations were false. The Court addresses each of the Statements below.

### 1. Statement No. 16

LabMD does not advance sufficient facts showing actual malice with respect to Statement No. 16. Rather, the evidentiary record supports the opposite conclusion. In his declaration, Boback asserts that he believed Statement No. 16 was true. ECF No. 418-1 ¶ 17. LabMD readily admits that, at the time Boback made Statement No. 16, Boback and Tiversa routinely took the position that files in a shared folder on LimeWire are considered "publicly available." ECF No. 434 ¶ 55. Given there is no dispute that the 1718 File was placed in shared folder on LimeWire, Boback's assertion that the file was "publicly available" is therefore consistent with his prior statements. In light of this unrefuted evidence of this pattern of behavior by Boback, LabMD has failed to show that Boback made Statement No. 16 with an awareness of "probable falsity." See Joseph, 129 A.3d at 437.

At the same time, the language Boback used is broadly consistent with public discourse regarding the 1718 File and other files made available on P2P networks. With respect to whether the file was "publicly available," for example, the United States Court of Appeals for the D.C. Circuit held it was undisputed that "the 1718 File was ***publicly available*** from a LabMD computer on LimeWire's peer-to-peer network, and that Tiversa was able to access and download the file over that system." Daugherty v. Sheer, 891 F.3d 386, 391-92 (D.C. Cir. 2018) (emphasis added). Using similar language, the United States Court of Appeals for the Eleventh Circuit held in a separate LabMD lawsuit that P2P networks "allow users to place ***shared computer files*** in folders that are ***open for other users*** to search via the internet." LabMD, Inc. v. Tiversa, Inc., 509 F. App'x 842, 843 (11th Cir. 2013) (emphasis added).

Consistent with these holdings, other courts addressing the issue of files available on P2P networks have held that the files are available to the public and there is no reasonable expectation of privacy for files shared on P2P networks. See, e.g. Motown Record Co., L.P. v. Kovalcik, No. 07-cv-4702, 2009 WL 455137, at *3 (E.D. Pa. 2009) (finding that because the accessed files were located in a shared folder on a P2P network, "[n]o authorization was needed since the files accessed were accessible to the general public"); Loud Records LLC v. Minervini, 621 F. Supp. 2d 672, 678 (W.D. Wis. 2009) (holding that files on P2P network were "accessible by the public"); U.S. v. Brashear, No. 4:11-CR-0062, 2013 WL 6065326, at *2 (M.D. Pa. Nov. 18, 2013) ("Numerous cases have held that there is no reasonable expectation of privacy in files made available to the public through peer-to-peer file sharing programs").

With respect to the 1718 File, the FTC concluded that "LabMD made the ***file freely available for public viewing***." ECF No. 418-12 (emphasis added). At a July 24, 2014, Congressional Hearing regarding the FTC's Enforcement Action, moreover, former Congressman

Elijah Cummings made a statement that "Mr. Daugherty admits that more than 900 files on his billing manager's computer **were accessible for public sharing** and downloading, which is a major security breach." ECF No. 418-11 ¶ 18 (emphasis added).

Prior to making Statement No. 16, Boback further claims that he reviewed various sources consistent with his belief that a file shared over a P2P network is considered "publicly available." This includes a *Computer World* article titled *Don't Except Data on P2P Networks to be Private, Judge Rules*; Daugherty's statements in *The Devil Inside the Beltway*, including that "LimeWire was an unruly beast that could cause [the billing manager] to expose her workstation files without her ever knowing;" Representative Cummings' statement at the July 24, 2014 hearing that the file was "accessible for public sharing;" and Tiversa's filing in <u>LabMD, Inc. v. Tiversa, Inc.</u>, No. 11-cv-2044 (N.D. Ga. Nov. 30, 2011), in which Tiversa took the position that the 1718 file was "publicly available on a P2P network." <u>See</u> ECF No. 418-1 ¶¶ 4, 5, 7, 10, 12. In addition, Boback claims in his declaration that the term "publicly available" was "widely used in the data security sector to describe files accessible via peer-to-peer programs such as LimeWire." <u>Id.</u> ¶ 16.

While LabMD points to purported evidence of actual malice, it is not sufficient to satisfy LabMD's heightened burden of proof. In particular, LabMD asserts that Boback acted with actual malice because Wallace actually used EP2P to locate the 1718 File. Whether Wallace used EP2P is not relevant, however, because Statement No. 16 does not relate to how the file was found. In relevant part, Boback asserts that the 1718 File was "publicly available" because a LabMD employee installed LimeWire on her computer. The details of how Wallace did, or did not, access the file do not bear on the truth of this Statement, let alone prove that Boback knew it was false.

LabMD further points to evidence of Defendants' purported desire to retaliate against LabMD or Daugherty. Defendants' "ill will" or "desire to harm plaintiff's reputation," without

more, however, is insufficient to establish actual malice.  <u>Lewis</u>, 833 A.3d at 192.  The particular evidence LabMD refers to, including Boback's negative comments to event organizers and purported falsehoods regarding the "spread" of the 1718 File, do not speak to Boback's knowledge or belief as to whether the 1718 File was "publicly available."  In sum, because Boback routinely took the position that files available on P2P networks are "publicly available," there is nothing to suggest this characterization was motivated by animus toward LabMD.  Accordingly, construing the evidence in the light most favorable to LabMD, LabMD has failed to meet the requisite threshold of proving actual malice with respect to Statement No. 16.

### 2.  Statement No. 13

 LabMD also does not advance sufficient evidence to prove actual malice with respect to Statement No. 13.  Based on the record, there is evidence that Boback believed Statement No. 13.  Boback claims it is his belief that a person or company that places documents into a shared folder is responsible for "leaking" the documents.  ECF No. 418-1 ¶ 1.

LabMD does not point to sufficient evidence that proves Boback knew this statement was false, or that he acted with probable knowledge it was false.  In particular, LabMD argues that Boback's use of the word "leak" is clearly false, because it stretches the word beyond any reasonable application.  Defendants point to evidence in the record, however, that the same or similar language was used by others—including Daugherty.

For example, Daugherty discussed LabMD's fight with the FTC in his blog and explained that the company is "challenging whether a minor data leak of dubious origins that led to no consumer harm is subject to the FTC's authority."  ECF No. 416 ¶ 13.  In *The Devil Inside the Beltway*, Daugherty described files shared over P2P networks as "LimeWire leaks."  Daugherty interviewed for, and widely shared, an article about LabMD titled *A Leak Wounded This Company.*

*Fighting the Feds Finished it Off.*  Using similar language, the FTC concluded that the installation of the file-sharing software led "to the unauthorized disclosure of the information."  ECF No. 416 ¶ 23; ECF No. 418-12 at 2.  In addition, Boback claims that the use of the word "leak" was used in the data security sector to describe files accessible via P2P networks.  ECF No. 418-1 ¶ 16.

LabMD further argues that Wallace's use of EP2P creates a question of fact on this issue. Wallace testified, however, that while he may have used EP2P to locate the 1718 File, he downloaded the file using P2P.[21]  Moreover, LabMD does not point to evidence that Boback knew this information at the time he made the Statements.  Daugherty claims in his declaration that Wallace testified in 2015, under criminal immunity, that he used a standard "off-the-shelf" P2P to obtain the 1718 File.  ECF No. 433-1 ¶ 38.  There is no evidence presented that Boback had knowledge to the contrary in 2015, and thus a jury could not reach this conclusion without speculation.

To the extent LabMD argues that Boback fails to provide relevant context, this does not prove Boback acted with actual malice.  First, LabMD does not establish that a failure to provide mitigating context renders Statement No. 13 false, as opposed to "exceedingly deceptive," as LabMD argues.  Second, it is LabMD that takes this Statement out of its relevant context.  Taken as a whole, Boback's letter does not imply that LabMD intentionally leaked confidential information or "gave permission" for Tiversa to take the 1718 File.  Rather, just after Statement No. 13, Boback asserts that the file was "leaked" because a company employee violated LabMD's

---

[21]  LabMD submits an expert Declaration of Daniel L. Regard II ("Regard"), in which he states his "opinion that the 1718 File was not taken by Tiversa, or anyone else, via LimeWire."  ECF No. 433-18.  For the reasons set forth in its separate opinion, the Court strikes Regard's declaration.  ECF No. 463.  Even if Regard's opinion could be relied upon to counter the undisputed facts in the record, it still would not give rise to clear and convincing evidence that Boback made Statement No. 13 with knowledge or reckless disregard of whether it was false.  As discussed above, LabMD does not endeavor to prove that Boback knew that P2P was not, or could not be, used to download the 1718 File, as Regard opines.

policy by installing LimeWire, and this resulted in the "exposure" of patient information. Thus, viewed in context, Boback does not imply that LabMD intentionally disclosed the 1718 File, or even that it permitted its employees to use P2P networks.

Finally, for the reasons previously discussed, Boback's purported animus toward LabMD does not, standing alone, prove that Boback knew Statement No. 16 was false or acted with reckless disregard as to whether it was false. Accordingly, the record does not support a finding of actual malice by clear and convincing evidence.

Construing the evidence in the light most favorable to LabMD, LabMD has failed to establish that the alleged defamatory Statement Nos. 13 and 16 caused special harm to LabMD, as required to establish a defamation claim under the applicable Pennsylvania statute. Therefore, the Court is required to enter summary judgment in favor of Defendants.

## IV. CONCLUSION

For the foregoing reasons, the Court grants the Motions for Summary Judgment. An appropriate order follows.

## **ORDER**

AND NOW, this 24th day of March 2020, IT IS HEREBY ORDERED that Defendant Tiversa Holding Corp.'s Motion for Summary Judgment, ECF No. 414, and Defendant Robert J. Boback's Motion for Summary Judgment, ECF No. 419, are GRANTED. Accordingly, it is FURTHER ORDERED that the remaining portion of Count II of LabMD's Amended Complaint is dismissed with prejudice.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if the Plaintiff wishes to appeal from this Order he or she must do so within

thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P., with the Clerk

of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.

BY THE COURT:

*/s/ Maureen P. Kelly*
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:     All counsel of record via CM-ECF