### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LABMD, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 15-92 |
| | ) | Magistrate Judge Maureen P. Kelly |
| | ) | |
| TIVERSA HOLDING CORP. *formerly* | ) | Re: ECF Nos. 643 and 645 |
| *known as* TIVERSA, INC. and ROBERT J. | ) | |
| BOBACK, | ) | |
| | ) | |
| Defendants. | ) | |

### <u>MEMORANDUM OPINION</u>

Presently before the Court is the Motion for Summary Judgment filed by Defendant Robert J. Boback ("Boback"), ECF No. 643, and the Motion for Summary Judgment filed by Defendant Tiversa Holding Corp. ("Tiversa"), ECF No. 645. For the reasons that follow, each of these Motions for Summary Judgment will be granted, and summary judgment shall be entered in Defendants' favor on the remaining portions of Count II of the Amended Complaint.[1]

## I.   PROCEDURAL AND FACTUAL HISTORY

The parties, at this stage of the proceedings, are well-acquainted with the factual allegations and history of this matter. The Court will nonetheless provide a brief summary.

### A.   Procedural History

Plaintiff LabMD, Inc. ("LabMD") commenced this action by filing a Complaint on January 21, 2015. ECF No. 1. After the disposition of two motions to dismiss, ECF Nos. 34, 36, 70, 115,

---

[1]   In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct all proceedings in this case, including the entry of a final judgment. ECF Nos. 249 and 250.

LabMD filed the operative First Amended Complaint ("Amended Complaint") on February 12, 2016. ECF No. 125. In the Amended Complaint, LabMD alleged a shakedown scheme in which Defendants conspired to infiltrate LabMD's computer systems and, upon gaining access, created a data security breach in LabMD's computer files. Id. ¶ 4. By virtue of this breach, Tiversa obtained a 1718-page file containing confidential patient health-related data ("1718 File"). Id. ¶¶ 37-38. With this file as proof of a breach, Tiversa then offered to sell LabMD its services to remedy the breach. Id. ¶¶ 43, 59. When LabMD refused to purchase such services, Defendants turned to the Federal Trade Commission ("FTC") and reported that due to LabMD's failed data security protocols, confidential patient health and personal information was disseminated on peer-to-peer networks for use by identity thieves. Id. ¶¶ 4, 77-83. The FTC instituted an administrative action. In the Matter of LabMD, Inc., No. 9357 (FTC). LabMD alleges that as a result of Defendants' conduct, it is now "an insolvent shell of a company." ECF No. 125 ¶ 1.

Defendants filed a Motion to Dismiss the Amended Complaint on March 11, 2016. ECF No. 137. On October 7, 2016, this Court issued a Report and Recommendation ("2016 R&R") recommending that the Motion to Dismiss be granted as to Count II (defamation *per se*) in regard to Defamatory Statement Nos. 1-12, 14-15, and 17-20;[2] Count III (tortious interference with existing and prospective business relationships); Count IV (fraud); Count V (negligent misrepresentation); and Count VI (civil conspiracy). ECF No. 166. It was further recommended that the Motion to Dismiss be denied as to Count II, the defamation *per se* claim, as to the two

---

[2]    Counts I, VII and VIII of LabMD's original Complaint had previously been dismissed with prejudice, while Counts II, III, IV, V, and VI were dismissed without prejudice with leave to amend. ECF Nos. 115, 129. LabMD did not replead a claim under Count I in the Amended Complaint, so its first numbered claim is the defamation *per* se claim at Count II. ECF No. 125.

other allegedly defamatory statements. Id. The 2016 R&R was adopted by United States District Judge Mark R. Hornak on November 23, 2016. ECF No. 185.[3]

The parties conducted extensive fact discovery as to LabMD's only remaining claim – defamation *per se* relative to Statement Nos. 13 and 16 – which closed on July 1, 2019. ECF No. 349. Defendants then filed their initial Motions for Summary Judgment, ECF Nos. 414, 419, to which LabMD filed Briefs in Opposition, ECF Nos. 431, 432. On March 24, 2020, the Court granted summary judgment on behalf of Defendants. ECF Nos. 464, 465. LabMD appealed this decision, as well as several other orders of this Court, to the United States Court of Appeals for the Third Circuit, including Judge Hornak's Order adopting the 2016 R&R. ECF Nos. 468, 469, 522, 527.

Upon review, the Third Circuit vacated Judge Hornak's Order adopting this Court's recommendation to dismiss LabMD's defamation *per se* claim relative to Statement Nos. 10, 14, 15, 17, and 18, along with the undersigned's later Order granting summary judgment on behalf of Defendants relative to Statement Nos. 13 and 16. It remanded for further proceedings. LabMD, Inc. v. Boback, 47 F.4th 164 (3d Cir. 2022).

As to Statement Nos. 10, 14, 15, 17, and 18, the Third Circuit disagreed that LabMD had conceded the non-defamatory nature of those statements in responding to the Motion to Dismiss. The Third Circuit found that while LabMD had focused on the phrases "indisputable fact," "leaked," and "publicly available" that appear in Statement Nos. 13 and 16 (which the Court did not dismiss), Statement Nos. 10, 14, 15, 17, and 18 (which the Court did dismiss) contained similar language or characterizations. Based on this, the Third Circuit found that this Court had too

---

[3]    As noted, the parties later consented to the jurisdiction of a United States Magistrate Judge to conduct proceedings in this case. ECF Nos. 249 and 250.

narrowly construed LabMD's argument and that it was improper to grant the Motion to Dismiss on this basis relative to Statement Nos. 10, 14, 15, 17, and 18.  Id. at 183-85.

As a result, the Third Circuit directed as follows:

> We will therefore direct the reinstatement of LabMD's defamation claim pertaining to Statements 10, 14, 15, 17, and 18.  On remand, the District Court may consider any other arguments Tiversa has made in favor of dismissing the claim as to those statements.

Id. at 185.

The Third Circuit also vacated the Court's Order granting summary judgment on the defamation *per* se claim as to Statement Nos. 13 and 16.  In so doing, the Third Circuit emphasized that the Court's "decision on summary judgment turned on whether LabMD could establish that it was harmed by Boback's statements."  Id. at 186.  It noted that this Court had found that LabMD could establish neither actual nor presumed damages.  See id.  While acknowledging that LabMD conceded the lack of actual damages, see id., the Third Circuit found that this Court abused its discretion in prohibiting LabMD from submitting expert evidence as to the issue of whether the alleged defamatory statements were made with "actual malice," a requirement for proving presumed damages under Pennsylvania law.  Id. 186-87.  The Third Circuit further stated that "[e]xpert insight into the technical workings of P2P networks and available search software clearly would have aided that determination and should have been allowed."  Id. at 187.  It remanded and indicated that the Court should permit LabMD to present such expert evidence.  See id. at 188.[4]

---

[4]    The Third Circuit affirmed the dismissal of Counts III, IV, and V of the Amended Complaint.  See id. at 179.  LabMD did not challenge the dismissal of Count VI.  The Third Circuit also affirmed the dismissal of Counts VII and VIII (alleging violations of the Racketeer Influenced and Corrupt Organizations Act) of the initial Complaint.  See id.  LabMD did not challenge the dismissal of its conversion claim at Count I of the initial Complaint on appeal.

Upon remand, the Court entered an Order dated December 15, 2022, reinstating LabMD's defamation *per se* claim at Count II as to Statement Nos. 10, 14, 15, 17, and 18 and ordering supplemental briefs. ECF Nos. 561, 562. Defendants subsequently filed a supplemental brief in support of their Motion to Dismiss, which LabMD opposed. ECF Nos. 564, 565. On March 29, 2023, the Court denied this renewed motion. ECF Nos. 569, 570. On May 5, 2023, Defendants Tiversa and Boback each filed an Answer to the Amended Complaint. ECF Nos. 575, 576. The parties then proceeded to conduct additional discovery. ECF No. 580.

On February 28, 2025, the Court issued a summary judgment scheduling order. ECF No. 627. The parties submitted a Joint Statement of Undisputed Facts on May 2, 2025. ECF No. 631. Tiversa and Boback each filed a Concise Statement of Material Facts and Appendix, ECF Nos. 634-642. On June 2, 2025, Tiversa and Boback filed the instant Motions for Summary Judgment and Briefs in Support. ECF Nos. 643, 644, 645, 646.

In August 2025, LabMD filed a Memorandum of Law in Opposition to the Motions for Summary Judgment ("Memorandum in Opposition"). ECF No. 670.[5] It also filed Responses to Defendants' Motions for Summary Judgement and Concise Statements of Material Facts and an Appendix. ECF Nos. 659-669, 671-674.

Defendants filed a Joint Supplement to the Appendix on September 25, 2025. ECF No. 682. On September 29, 2025, Boback and Tiversa submitted responses to LabMD's Concise Statement of Material Facts and Reply Briefs. ECF Nos. 683, 684, 686, 687. LabMD filed a Sur-reply on October 29, 2025. ECF No. 688.

The Motions for Summary Judgment are now ripe for consideration.

---

[5] Although LabMD's Memorandum in Opposition filed at ECF No. 670 purports to be in opposition to Tiversa's Motion for Summary Judgment, it is clearly in response to both Tiversa's and Boback's Motions for Summary Judgment.

**B.      Salient Facts**

**1.      Parties**

Until January 2014, LabMD, a Georgia corporation, was a cancer detection facility. ECF No. 631 ¶ 2. It provided uropathology and microbiology laboratory services to approximately 70 physician customers. ECF No. 433-1 ¶ 3. At all relevant times, Michael J. Daugherty ("Daugherty") was the sole shareholder, Chief Executive Officer ("CEO"), and President of LabMD. ECF No. 631 ¶ 3. Tiversa, a Pennsylvania corporation, was a cybersecurity company. ECF No. 434 at 1. From 2006 until 2016, Boback was the CEO of Tiversa. ECF No. 631 ¶ 1.

**2.      1718 File**

The relevant facts in this case arise primarily out of an incident in February 2008, in which a former Tiversa employee, Richard Wallace ("Wallace"), accessed the 1718 File – a 1718-page PDF document containing the personal health information of approximately 9300 patients – from a LabMD employee's work computer.[6] ECF No. 417 at 1; ECF No. 641 ¶ 19.[7] At that time, LabMD's billing manager had LimeWire, a particular type of peer-to-peer ("P2P") software,

---

[6]      This is one of numerous lawsuits filed across various jurisdictions by LabMD and/or Daugherty arising out of Tiversa's access of the 1718 File and the FTC's subsequent investigation into LabMD. See United States of America ex rel. Daugherty v. Tiversa, et al., No. 14-cv-4548 (S.D.N.Y. June 24, 2014); Daugherty & LabMD v. Adams, et al., No. 17-368 (W.D. Pa. Mar. 23, 2016); LabMD v. The Privacy Institute, et al., No. 19-852 (E.D. Va. June 26, 2019); LabMD v. Tiversa, et al., No. 11-4044 (N.D. Ga. Nov. 23, 2011); LabMD v. FTC, et al., No. 13-1787 (D.D.C. Nov. 14, 2013); LabMD v. FTC, 14-810 (N.D. Ga. Mar. 20, 2014); Daugherty & LabMD v. Sheer, et al., No. 15-2034 (D.D.C. Nov. 20, 2015); LabMD & Daugherty v. Tiversa, et al., No. 17-1365 (W.D. Pa. Oct. 20, 2017); LabMD & Daugherty v. Buchanan, et al., 18-3790 (S.D.N.Y. Apr. 2, 2018); LabMD & Daugherty v. Buchanan, et al., No. 160929/2018 (N.Y. Sup. Ct. Nov. 21, 2018). LabMD also petitioned for review of the order issued by the FTC. See LabMD v. FTC, No. 16-16270 (11th Cir. Sept. 29, 2016).

[7]      Tiversa's Concise Statement of Material Facts, ECF No. 641, and Boback's Concise Statement of Material Facts, ECF No. 642, are substantially similar in most ways. For clarity and brevity, the Court will generally cite to ECF No. 641 when the two Concise Statements are in accord.

6

installed on her work computer. ECF No. 641 ¶¶ 5-6. A P2P network is created when two or more computers are connected and share resources without going through a separate central server computer. ECF No. 631 ¶ 10. The purpose of most P2P networks is to search for, identify, and share files stored on computers. Id. ¶ 12; ECF No. 641 ¶ 1. P2P software typically allows users to share files within a folder on their computer that has been designated for sharing. ECF No. 641 ¶ 2. These programs enable one computer to search a limited number of other computers for all files that have been made available for sharing by other computer users, so long as the other computers are also using the file-sharing application and are within the radius of the search. Id. ¶ 3. The only requirements for a computer to join a P2P network are an internet connection and the P2P software, such as LimeWire. Id. ¶ 4.

The 1718 File was stored in the "My Documents" folder on the computer of LabMD's billing manager, and this same folder was designated for sharing over LimeWire. Id. ¶¶ 7-8. As a result, LabMD admits that the billing manager "expose[d] sensitive material through her computer." Id. ¶ 9. Wallace testified that he identified and downloaded the 1718 File using a stand-alone computer and P2P software. Id. ¶ 19. Wallace believed a program called "EP2P" that he had received from Federal Bureau of Investigation ("FBI") Agent Greg Funkhauser was first used to search and browse the host computer and to locate and identify the file. Id. ¶ 20; ECF No. 672 ¶¶ 19-20, 50. EP2P had functions that other P2P software did not that made it more efficient and convenient when searching LimeWire. ECF No. 672 ¶¶ 51-53. Wallace believed he downloaded the 1718 File using LimeWire. ECF No. 641 ¶ 21.

### 3.    FTC Investigation

The FTC became aware that LabMD patient information was available on a P2P network based on information provided to it by Tiversa. ECF No. 672 ¶ 70. It launched a non-public

inquiry into LabMD's data security practices and gave notice of the inquiry to LabMD in January 2010. ECF No. 433-1 ¶ 13; see also LabMD v. FTC, 776 F.3d 1275, 1277 (11th Cir. 2015). Thereafter, on August 29, 2013, the FTC filed an enforcement action against LabMD (the "Enforcement Action"). ECF No. 433-1 ¶ 18. The FTC alleged that LabMD had violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), by failing to employ reasonable and appropriate measures to prevent unauthorized access to confidential consumer communication. Id.

At a July 24, 2014 Congressional Hearing in connection with the FTC's Enforcement Action, former Congressman Elijah Cummings made a statement that "Mr. Daugherty admits that more than 900 files on his billing manager's computer were accessible for public sharing and downloading, which is a major security breach." ECF No. 418-11 ¶ 18.

An administrative law judge ("ALJ") dismissed the action, but on July 29, 2016, the FTC, upon review, reversed the ALJ's decision and found that LabMD's security practices constituted an unfair act or practice under Section 5. ECF No. 418-12. In so finding, the FTC stated that "the record does not show that Tiversa, whatever its motives, unlawfully obtained the 1718 file; LabMD made the file freely available for public viewing through LimeWire." Id. at 32. The FTC also found that it was the "installation of file-sharing software that exposed" the 1718 File "on a peer-to-peer network accessible by millions of users." Id. at 2.

Enforcement of the FTC's Order was stayed, however, pending appeal. LabMD, Inc. v. FTC, 678 F. App'x 816 (11th Cir. 2016). On June 6, 2018, the United States Court of Appeals for the Eleventh Circuit vacated the FTC's order, holding that the order was unenforceable because it did not enjoin a specific act or practice. LabMD, Inc. v. FTC, 894 F.3d 1221 (11th Cir. 2018). In describing the factual background of the case, the Eleventh Circuit noted that "the billing manager designated the contents of the 'My Documents' folder on her computer for sharing, exposing the

content to the other users" and that the folder, from July 2007 to May 2008, contained the 1718 File. Id. at 1224.

### 4.   Alleged Defamatory Statements

At Count Two of the Amended Complaint, LabMD alleges that statements made by Boback concerning the 1718 File in two separate publications, *The Pathology Blawg* and *The Wall Street Journal*, were defamatory.[8]   ECF No. 125 ¶¶ 159-174; ECF No. 631 ¶¶ 6, 9; ECF No. 631-1; ECF No. 631-2.

### a.   *The Pathology Blawg* (Statement Nos. 10, 13, and 14)

Approximately one year after LabMD closed its lab, on February 10, 2015, Boback submitted a four-page article in response to a request for comment on this lawsuit from the author of *The Pathology Blawg*.  ECF No. 631 ¶ 6; ECF No. 631-1.  *The Pathology Blawg* is a website that "mainly deals with medicolegal issues in pathology and laboratory medicine."  ECF No. 421-2.  Included in this four-page article were the following statements alleged by LabMD to be defamatory:

> After all, we found this file in a public file sharing network that was accessible by millions of people from around the world. (Statement No. 10).

> LabMD lawsuit – The claims are baseless and completely unsubstantiated …. even in the complaint itself.  This appears to be another attempt by Daugherty to distract people from the INDISPUTABLE FACT that LabMD and Michael Daugherty leaked customer information on nearly 10,000 patients. (Statement No. 13).

> To my understanding from the deposition transcripts, LabMD had a policy against installing file sharing software.  An employee at

---

[8]     LabMD initially identified twenty defamatory statements at Count Two of the Amended Complaint.  ECF No. 125 ¶¶ 83, 130, 133, 135.  Allegations as to thirteen of these statements have been dismissed, leaving seven statements – Statement Nos. 10, 13, 14, 15, 16, 17, and 18 – remaining.

> LabMD violated that policy, which resulted in the exposure of nearly 10,000 patients['] private information. This clearly demonstrates that LabMD DID NOT adequately protect their patient's [sic] PHI/PII, which is al[l] that the FTC needs to demonstrate. Case closed. The rest of this is just a desperate attempt to distract everyone from that INDISPUTABLE FACT. (Statement No. 14).

ECF No. 631-1. LabMD alleges that these statements "are expressly and/or impliedly false because the 1718 File was not found in 'a public file sharing network that was accessible by millions of people from around the world.'" ECF No. 125 ¶ 134.

In a declaration dated September 23, 2019, Daugherty claims that the false statements made in *The Pathology Blawg* will "make it even more difficult for LabMD to return to business as a cancer detection laboratory" because LabMD must employ a certified uropathologist as director of its laboratory. ECF No. 433-1 ¶ 28. Daugherty claims that, because these statements were directed to these medical professionals, "LabMD will have to spend even more time and money attempting to rehabilitate its reputation so that it can attract qualified uropathologists." Id.

####    b.    *The Wall Street Journal* (Statement Nos. 15, 16, 17, and 18)

On December 9, 2015, *The Wall Street Journal* published a letter to the editor authored by Boback. ECF No. 631 ¶ 9; ECF No. 631-2. Boback's letter is framed in response to an op-ed by LabMD's counsel Dan Epstein titled "Hounded Out of Business by Regulators," which was published in *The Wall Street Journal* on November 20, 2015. ECF No. 631 ¶¶ 7-9; ECF No. 417 ¶ 8. Epstein's op-ed discussed Tiversa's download of the 1718 File in 2008, the FTC Enforcement Action against LabMD, and the fact that the "six-year federal investigation forced LabMD to close last year." ECF No. 417 ¶ 9.

Included in Boback's letter were the following statements alleged by LabMD to be defamatory:

10

LabMD, a Georgia-based cancer screening company, admits its own employee mistakenly exposed the confidential medical records of nearly 10,000 individuals on the Internet. (Statement No. 15).

LabMD's CEO Michael Daugherty admits that a LabMD employee improperly installed LimeWire file-sharing software on a company computer. Doing so made confidential patient information publicly available over the Internet. (Statement No. 16).

Using this information, LabMD discovered that it had peer-to-peer sharing software on a company computer. Without Tiversa's free information, LabMD would have never known it was continuing to publicly expose patient information. (Statement No. 17).

The suggestion that Tiversa provided information on exposed files to the Federal Trade Commission as a means of retribution because LabMD didn't hire Tiversa is 100% false. (Statement No. 18).

ECF No. 631-2. LabMD alleges that these statements are "expressly and/or impliedly false because LabMD never admitted that any of its employees ever exposed anything on the Internet," and "[a]n installation of LimeWire did not make confidential patient information publicly available over the Internet." ECF No. 125 ¶ 136.

In his declaration, Daugherty claims that the false statements made in *The Wall Street Journal* will "make it even more difficult for LabMD to return to business as a cancer detection laboratory." ECF No. 433-1 ¶ 29. Daugherty asserts that investors read *The Wall Street Journal*, and these statements were targeted to investors and the business community. Id. He notes that this article remains available online to subscribers of *The Wall Street Journal*. Id.

### 5.    Public Discourse by Daugherty

In 2013, Daugherty wrote and published a book titled *The Devil Inside the Beltway*. ECF No. 631 ¶ 4. In his book, Daugherty discussed Tiversa's download of the 1718 File, P2P software, and LabMD's dispute with the FTC. Id. ¶ 5. He further described inadvertent file sharing over P2P networks as "LimeWire leaks" and stated that "LimeWire was an unruly beast that could also

11

cause [the billing manager] to expose her workstation files without her even knowing." ECF No. 418-4 at 5-8; ECF No. 641 ¶ 27. Daugherty continues to promote *The Devil Inside the Beltway*, including through his website and linked social media accounts. ECF No. 641 ¶ 28. He believes that his book has helped to restore LabMD's reputation. ECF No. 433-1 ¶ 24.

In a December 16, 2013 interview on the *Free Talk Live* podcast, Daugherty, in discussing P2P networks, referred to them as "leaky and sneaky" and said that "employees were using this and they were, without their knowledge, sharing important information." ECF No. 641 ¶ 124. During a November 23, 2015 interview with CDT Tech Talks, Daugherty, in discussing the 1718 File, stated "it was only exposed one folder on one file, and she, it was inadvertently shared." Id. ¶ 26(a). In a separate interview that same day, Daugherty said, "because one employee had LimeWire on one work station, they expose one folder against company policy." Id. ¶ 26(b).

After the alleged defamatory statements were made, on April 25, 2016, Bloomberg published an article about LabMD and Daugherty titled, "A Leak Wounded This Company. Fighting The Feds Finished It Off." ECF No. 631 ¶ 13. The article discussed that LabMD's billing manager had left the 1718 Report in a folder on LimeWire, "open for sharing with other users of the peer-to-peer network." ECF No. 631-3 at 2.

### 6.    Boback's Declaration

In a declaration dated August 20, 2019, in regard to Statements 13 and 16 ("Boback Declaration"),[9] Boback asserted that he believed Statement Nos. 13 and 16 to be true when he made them. ECF No. 634-19 ¶ 17. He asserted that he routinely took the position that files in a

---

[9]    At the time Boback submitted the Boback Declaration, Statement Nos. 13 and 16 were the only remaining statements at issue in the case. However, Statement No. 13 was merely part of *The Pathology Blawg* article that also contained Statement Nos. 10 and 14, and Statement No. 16 was part of *The Wall Street Journal* letter that also contained Statement Nos. 15, 17, and 18.

shared folder on LimeWire are considered publicly available, and that he believed that a person or company that placed documents in a shared folder was responsible for leaking the documents. Id. ¶¶ 11, 14. In addition, Boback claimed that the terms "leak" and "publicly available" "were widely used in the data security sector to describe files accessible via peer-to-peer programs such as LimeWire." Id. ¶ 16.

Prior to making Statement Nos. 13 and 16, Boback claimed that he reviewed various sources consistent with his belief that a file shared over a P2P network is considered "publicly available." This included a *Computer World* article titled "Don't Except Data on P2P Networks to be Private, Judge Rules," Daugherty's statements in *The Devil Inside the Beltway*, including his use of the word "leak" and his statement that "LimeWire was an unruly beast that could cause [the billing manager] to expose her workstation files without her ever knowing," Representative Cummings' statement at the July 24, 2014 hearing that the 1718 File was "accessible for public sharing," and Tiversa's filing in LabMD, Inc. v. Tiversa, Inc., No. 11-cv-2044 (N.D. Ga. Nov. 30, 2011), in which Tiversa took the position that the file was "publicly available on a P2P network." Id. ¶¶ 4-7, 9-10, 12. He also claimed to have reviewed case law relating to P2P networks prior to February 10, 2015. Id. ¶¶ 8, 13.

## II.    LEGAL STANDARD

Summary judgment is properly entered "if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Cattrett, 477 U.S. 317, 322 (1986). Under this standard, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "[A] fact is

'material' where 'its existence or nonexistence might impact the outcome of the suit under the applicable substantive law.'" Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019) (citations omitted). "A dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" Clews v. Cnty. of Schuylkill, 12 F.4th 353, 358 (3d Cir. 2021) (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of establishing that the evidence fails to support one or more essential elements of the non-moving party's claim, while the non-movant must establish the existence of each element for which it bears the burden of proof at trial. Celotex, 477 U.S. at 322-23; see also Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). The parties must support their positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)) (internal quotations omitted).

In making this assessment, the court must view the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in favor of the non-moving party. See Matreale v. New Jersey Dep't of Mil. & Veterans Affs., 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001). If the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 requires the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## III.    DISCUSSION

As discussed, the sole remaining claim in this case is a portion of LabMD's allegation of defamation *per se* at Count Two of the Amended Complaint. Defendants argue that there are no material facts in dispute as to the truth of the remaining seven statements alleged to be defamatory. They further contend, in any event, that LabMD cannot establish presumed damages because there is no evidence to support that the statements were made with actual malice. ECF Nos. 644, 646. LabMD counters that there are material issues of fact that must be submitted to a jury, rendering summary judgment inappropriate. ECF No. 670. After careful review of the parties' arguments and the extensive record in this case, the Court agrees with Defendants that the entry of summary judgment is warranted.

### A.    Pennsylvania Defamation Law

Under Pennsylvania law, the elements of a defamation claim are codified by statute. In order to successfully establish a claim for defamation, a plaintiff has the burden of proving:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

15

(7) Abuse of a conditionally privileged occasion.

42 Pa. C.S. § 8343(a).

A defamatory statement is one that "tends so to harm the reputation of another as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him." U.S. Healthcare v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 923 (3d Cir. 1990) (quoting Birl v. Philadelphia Elec. Co., 167 A.2d 472, 475 (Pa. 1960)); Kuwait & Gulf Link Transp. Co. v. Doe, 216 A.3d 1074, 1085 (Pa. Super. Ct. 2019). The court determines, in the first instance, whether a statement is capable of defamatory meaning. See U.S. Healthcare, 898 F.2d at 923. If the court decides that it is capable of a defamatory meaning, then it is for the jury to decide whether the statement was understood as such by the reader or listener. Id.

Truth is an affirmative defense to defamation. See Tucker v. Fischbein, 237 F.3d 275, 287 (3d Cir. 2001) (citing 42 Pa. C.S. § 8343(b)(1)). As an affirmative defense, the burden of proving the truth of the defamatory communication is on the defendant. See 42 Pa. C.S. § 8343(b)(1). A defamation claim may be dismissed when the affirmative defense of truth is apparent on the face of a complaint. Morrison v. Chatham Univ., No. Civ. 16-476, 2016 WL 4701460, at *4 (W.D. Pa. Sept. 8, 2016). Further, pure expressions of opinion cannot support an action in defamation. McCafferty v. Newsweek Media Grp., Ltd., 955 F.3d 352, 357 (3d Cir. 2020); Braig v. Field Commc'ns, 456 A.2d 1366, 1372-73 (Pa. Super. Ct. 1983).

In regard to proving harm in a defamation case, there are two major categories of compensatory damages: "presumed" and "actual." Sprague v. American Bar Ass'n, 276 F. Supp. 2d 365, 368 (E.D. Pa. 2003). "'Presumed' damages are those that are expected to result from defamation; they require no proof, but instead, as reflected in their name, are presumed under the law. In contrast, actual damages require competent proof." Id. (citing Gertz v. Robert Welch,

16

Inc., 418 U.S. 323, 350 (1974)). To establish a right to presumed damages, a plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice, "i.e., 'with knowledge that [the statement] was false or with reckless disregard of whether it was false or not.'" Lewis v. Philadelphia Newspapers, Inc., 833 A.2d 185, 192 (Pa. Super. Ct. 2003) (quoting Curran v. Philadelphia Newspapers, Inc., 546 A.2d 639, 642 (Pa. Super. Ct. 1988)).

Tiversa and Boback raise several arguments as to why LabMD cannot meet its burden, including that the statements at issue are not capable of being understood as defamatory because they are true or substantially true and that the statements do not constitute defamation *per se* because LabMD was already out of business when the statements were made. ECF Nos. 644, 646. The Court does not reach these issues, however, because it agrees with Defendants that, in any event, the record cannot support a finding that LabMD is entitled to presumed damages.

## B.    Presumed Damages

LabMD has conceded that that it cannot establish actual damages but argues that the record can support a finding of presumed damages.[10] LabMD, 47 F.4th at 186. As discussed above, presumed damages "allow a defamation plaintiff to recover compensatory damages without proving the defamatory statement caused actual harm." Franklin Prescriptions, Inc. v. N.Y. Times Co., 424 F.3d 336, 341 (3d Cir. 2005). The rationale for allowing presumed damages in appropriate cases is "that it may be unfair to require proof of actual harm to reputation because reputational injury is difficult to prove and measure." Id.

---

[10]    Even assuming LabMD could pursue actual damages, to recover such damages as a limited purpose public figure would also require a showing of actual malice. See Gertz, 418 U.S. at 351. While the Court need not determine whether LabMD qualifies as a limited purpose public figure, it does note that the record tends to support a finding that the alleged defamation involves a public controversy and that LabMD was actively involved in this controversy. See Marcone v. Penthouse Int'l Mag. for Men, 754 F.2d 1072, 1081-82 (3d Cir. 1985).

17

### 1.   Actual Malice Standard

To establish a right to presumed damages, LabMD must prove by clear and convincing evidence that Boback and Tiversa acted with actual malice,[11] "i.e., 'with knowledge that [the Statements were] false or with reckless disregard of whether [they were] false or not.'" Lewis, 833 A.2d at 192 (quoting Curran, 546 A.2d at 642); Beverly Enters, Inc. v. Trump, 182 F.3d 183, 188 n.2 (3d Cir. 1999); Joseph v. Scranton Times L.P., 129 A.3d 404, 430 (Pa. 2015). In other words, it must show that Tiversa and Boback "in fact entertained serious doubts as to the truth of [their] publication[s]." Kuwait & Gulf Link, 216 A.3d at 1088 (quoting Curran, 546 A.2d at 642); Schiavone Construct. Co. v. Time, Inc., 847 F.2d 1069, 1089 (3d Cir. 1988). Courts have emphasized that establishing actual malice is a high bar. See Copeland v. Netflix, Inc., No. 1:24-cv-163, 2025 WL 3687742, at *8 (D. Del. Dec. 19, 2025).

"Because 'actual malice' is a fault standard, it is not shown by the falsity of the statement in and of itself." Lewis, 833 A.2d at 192. "[T]he standard is a subjective one – there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of ... probable falsity.'" Joseph, 129 A.3d at 437 (quoting Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688 (1989) (internal quotations omitted)). This state of mind may be proven through circumstantial evidence. Id. "[E]vidence of ill will or a defendant's desire to harm the plaintiff's reputation, although probative of the defendant's state of mind, without more, does not establish 'actual malice.'" Lewis, 833 A.2d at 192.

> [T]he requirement that the plaintiff be able to show actual malice by clear and convincing evidence is initially a matter of law. The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. This rule is premised on the unique character of the interest

---

[11]     "The clear and convincing evidence standard applies even at the summary judgment stage of a defamation proceeding." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 505 (E.D. Pa. 2010).

protected by the actual malice standard.  More fundamentally, the rule is derived from the recognition that judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice.

Joseph, 129 A.3d at 436 (internal citations omitted).

### 2.      The Parties' Positions

#### a.      Tiversa and Boback

Tiversa and Boback argue that a showing of actual malice requires that a defendant knew the statements were false or that they were made with reckless disregard for the truth and that LabMD cannot meet this standard by clear and convincing evidence.  ECF No. 644 at 24-33; ECF No. 646 at 29-31.  They assert that Boback, in making the statements, did no more than mirror language used by others, including Daugherty, to describe the public availability, exposure, and leak of the 1718 File.  They further contend that even if Boback's statements were inaccurate or false, there is no evidence that such an erroneous characterization was made with knowledge or reckless disregard of its falsity.  Id.

Defendants further emphasize that the undisputed facts confirm the appropriateness of Boback's use of the terms "publicly available," "exposed," and "leaked" in regard to the 1718 File.  In particular, they argue that LabMD has admitted that the 1718 File was stored in a folder that had been designated for sharing with other LimeWire users; that those files had been made available for sharing with other computer users; and that Daugherty himself endorsed other publications using the same, or similar, language regarding the 1718 File.  ECF No. 644 at 9-16; ECF No. 646 at 8-7, 14.  They further assert that Boback's statements were consistent with various courts' holdings regarding files stored on P2P networks and the 1718 File, specifically.  ECF No. 644 at 29; ECF No. 646 at 18-20.

19

### b.    LabMD

In its Memorandum in Opposition, LabMD argues that there are questions of fact regarding Defendants' actual malice, which preclude summary judgment.   It cautions against accepting Boback's "self-serving, subjective belief that he viewed the 1718 File as being publicly available, exposed and leaked." ECF No. 670 at 19.  Rather, it asserts that objective circumstantial evidence shows that, at the time the statements were made, Boback knew facts inconsistent with these statements, including:

(1)  Tiversa only ever found the 1718 File on a LabMD Computer;

(2)  Tiversa used [the proprietary law enforcement surveillance software EP2P] to find the file;

(3)  Tiversa had been unable to find the 1718 File even using its patented EagleVision software;

(4)  Tiversa had no evidence that the 1718 File was ever exposed to any member of the public; and

(5)  LabMD did not intentionally "leak" the 1718 File.

Id. at 20.

As to Boback's state of mind, LabMD argues that actual malice can be inferred because Defendants previously misrepresented the circumstances surrounding Wallace's acquisition of the 1718 File, including making false statements that the file had "spread" to computers of bad actors. Id. at 21-23.  LabMD contends that this, along with the lack of evidence that anyone other than Tiversa ever accessed the 1718 File, shows that Tiversa and Boback "had obvious reasons to doubt the veracity" of the challenged statements that the file was publicly available, exposed, and/or leaked. Id. at 22.

LabMD further argues: "Other evidence thoroughly examined in the export report of Daniel L. Regard II (ECF 668-2) further demonstrates the many inconsistencies in Defendants' positions regarding the 1718 File, and how the forensic evidence contradicts their story." Id. at 23.

LabMD dismisses Defendants' argument that the terms "publicly available," "exposed," and "leaked" were regularly used to describe files using LimeWire because such generic statements do not undermine the fact that the 1718 File "was never publicly accessible to any ordinary user of LimeWire or Gnutella due to the technical architecture of searching and downloading on LimeWire, the unique name of the file itself, and the existence of multiple redundant firewalls at LabMD." Id. (quoting ECF No. 667-1). LabMD argues that Daugherty's prior statements regarding the 1718 File are inapposite because he did not know that Wallace used EP2P to find the 1718 File, and therefore his prior statements were based on a "faulty premise." Id. at 23.

Finally, LabMD points to evidence of Tiversa and Boback's animus and actual ill-will against LabMD. It cites to Wallace's testimony in the Enforcement Action that Boback retaliated against LabMD for not hiring Tiversa, stating specifically in regard to Daugherty, "f--- him, and make sure he's at the top of the list." Id. at 24. It further refers to emails that a Tiversa board member, Joel Adams ("Adams"), exchanged with Boback in 2015. In these emails, Adams expressed anger at LabMD and stated "[w]e'll get those pricks" and "[c]losing in on mr. D." Id. at 24-25. LabMD further refers to several incidents in which Boback made negative comments about Daugherty to individuals associated with events at which Daugherty planned to speak. Id. at 25-26.

21

### 3.    Analysis

Boback and Tiversa, unsurprisingly, have submitted evidence that Boback believed his challenged statements to be true.  ECF Nos. 641, 638-3, 634-19.  However, as LabMD points out, "[a] plaintiff may 'rarely be successful in proving awareness of falsehood from the mouth of the defendant himself.'"  Schiavone Construct. Co., 847 F.2d at 1089 (quoting Herbert v. Lando, 441 U.S. 153, 170 (1979)).  Accordingly, Boback's own claims that he believed his statements were true cannot alone prevent a finding of actual malice; "objective circumstantial evidence can suffice to demonstrate actual malice."  Id. at 1089-90.  See also McCafferty, 955 F.3d at 359.

Nonetheless, even construing the evidence in the light most favorable to LabMD, the circumstantial evidence in the record does not support a finding of actual malice, much less under a clear and convincing evidence standard.  In this regard, it is important to remember that statements alleged to be defamatory must be viewed in context.  See Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213, 216 (Pa. 1981); Mzamane, 693 F. Supp. 2d at 477.  As the Pennsylvania Supreme Court has explained, "words which standing alone may reasonably be understood to be defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable."  Thomas Merton Ctr., 442 A.2d at 216 (quoting Restatement (Second) of Torts, § 563, comment d).  Therefore, in considering the defamatory statements here, the Court must consider the context of Boback's article in *The Pathology Blawg* and his letter to *The Wall Street Journal* "to determine 'the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average person among whom it is intended to circulate.'"  Id. (quoting Corabi v. Curtis Pub'g Co., 273 A.2d 899, 901 (Pa. 1971)).

### a.    *The Pathology Blawg* Statements

As discussed above, the following statements were included in a four-page article by Boback submitted to *The Pathology Blawg*:

> After all, we found this file in a public file sharing network that was accessible by millions of people from around the world. (Statement No. 10).
>
> LabMD lawsuit – The claims are baseless and completely unsubstantiated .... even in the complaint itself. This appears to be another attempt by Daugherty to distract people from the INDISPUTABLE FACT that LabMD and Michael Daugherty leaked customer information on nearly 10,000 patients. (Statement No. 13).
>
> To my understanding from the deposition transcripts, LabMD had a policy against installing file sharing software. An employee at LabMD violated that policy, which resulted in the exposure of nearly 10,000 patients['] private information. This clearly demonstrates that LabMD DID NOT adequately protect their patient's [sic] PHI/PII, which is al[l] that the FTC needs to demonstrate. Case closed. The rest of this is just a desperate attempt to distract everyone from that INDISPUTABLE FACT. (Statement No. 14).

ECF No. 631-1. LabMD has consistently contended that references to accessibility to the public, leaks, or exposure of information paint a false picture of what happened. However, reading the statements within the larger context of the article as a whole tells another story.

In this context, Boback's statement at Statement No. 10 that "we found this file in a public file sharing network that was accessible by millions of people from around the world," clearly referred to the 1718 File having been found on LimeWire. Id. at 2. In fact, this statement was included to convey uncertainty as to whether it was LabMD that even placed the file on LimeWire, as LimeWire is generally available to anyone. Id. at 1. In the article, Boback expressly stated that "it was highly unlikely that LabMD intentionally disclosed such information," id. at 1, and

explained that it was ultimately discovered that the 1718 File was put in the LimeWire file by an employee who had acted against company policy, id. at 2.

The context also provides a clearer understanding of Statement No. 13, in which Boback said that LabMD and Daugherty "leaked" customer information on nearly 10,000 patients. LabMD argues that there was no intentional leak of the 1718 File, presumably in asserting that the term "leak" necessarily implied intentionality. ECF No. 670 at 20. However, again, Boback specifically opined that it was highly unlikely that any such breach was intentional, rendering the interpretation of "leak" proposed by LabMD unreasonable. ECF No. 631-1 at 1.

Moreover, the context of the article shows that Boback had no basis for thinking Statement No. 14 that patients' private information was "exposed" was false or misleading. Indeed, the context shows that the term was used in the same way as the terms "publicly available" or "leak." As discussed above, the overall context shows that exposure was meant to convey that the 1718 File had been found on a P2P network.

Rather than considering the entire context in which the statements were made, LabMD has emphasized the manner in which Tiversa, and specifically Wallace, found the 1718 File, including the use of enhanced search software obtained from the FBI. ECF No. 670 at 20. However, Boback's statement in *The Pathology Blawg* does not address what type of search software was used to find the 1718 File; it merely states – correctly – that the file was found on LimeWire. As noted, the statement about a "public file sharing network accessible by millions of people around the world" was in reference to the fact that it may not even have been LabMD that was responsible for the 1718 File being placed on LimeWire.

LabMD may quibble over whether a recipient *could* take the statements differently, or that the exact phrasing used was not appropriate, but it cannot point to clear and convincing evidence

that Boback's statements were anything other than what he believed to be an accurate characterization within the greater context. Even assuming that Boback's phrasing may have been ambiguous, this alone "does not suffice to sustain the burden of establishing with convincing clarity knowing or reckless disregard of falsity." Pierce v. Cap. Cities Commc'ns, Inc., 576 F.2d 495, 509 (3d Cir. 1978). See also Fitzpatrick v. Philadelphia Newspapers, Inc., 18 Phila. Co. Rptr. 481, 486 (Pa. Ct. Comm. Pleas 1988) ("Therefore, actual malice cannot be established where a defendant has made one of several reasonable interpretations of an ambiguous situation or document."); Schiavone Construct. Co., 847 F.2d at 1090 (holding that an erroneous interpretation of the facts does not establish actual malice). This is true even to the extent the term used is hyperbolic or even "caustic and irritating." Pierce, 576 F.2d at 508. Accordingly, the context establishes that Boback was doing nothing more in Statement Nos. 10, 13, and 14 than indicating that the 1718 File was placed in a shared folder on LimeWire, which he reasonably characterized as being publicly available, leaving it leaked and exposed.

Other courts have found a lack of actual malice under somewhat similar facts. For example, in Brophy v. Philadelphia Newspapers, Inc., 422 A.2d 625 (Pa. Super. Ct. 1980), the plaintiffs argued that the use of the terms "vendetta," "conspiracy," "no accident," and "ambush" in discussing the fatal shooting of a police chief's son gave the impression that the plaintiffs had intentionally conspired to kill him. Id. at 629. In finding that the plaintiffs had failed to show that the statements were made with actual malice, the Superior Court stated, "A showing of no more than negligence, bad judgment or inaccuracy in the preparation and publication of [the article] is constitutionally insufficient to show the recklessness needed to prove actual malice." Id. at 633. It further emphasized that "[a]ctual malice cannot be inferred solely because the information gathered by the reporter is presented in an ambiguous and potentially defamatory manner." Id.

25

(citing <u>Pierce</u>, 576 F.2d at 509).  <u>See also Copeland</u>, 2025 WL 3687742 (explaining that a reasonable viewer would understand the suggestion that the plaintiff was "brainwashed" as no more than a hyperbolic way of expressing that the plaintiff had been strongly influenced by another).

While obviously not directly on point, these cases demonstrate that merely because the manner in which a statement is made could be construed to suggest some other meaning, without proof that the speaker had intent for such misinterpretation, a plaintiff cannot establish actual malice.  Here, the context in which Statement Nos. 10, 13, and 14 were made fail to show that Boback was implying anything other than that the 1718 File had inadvertently been placed on LimeWire.

That this was Boback's understanding is confirmed by other record evidence.  The language he used is broadly consistent with public discourse regarding the 1718 File and other files made available on P2P networks.  With respect to whether the file was "publicly available," for example, the FTC concluded that "LabMD made the *file freely available for public viewing*."  ECF No. 418-12 (emphasis added).  At a 2014 Congressional Hearing regarding the FTC's Enforcement Action, former Congressman Cummings made a statement that "Mr. Daugherty admits that more than 900 files on his billing manager's computer *were accessible for public sharing* and downloading, which is a major security breach."  ECF No. 418-11 ¶ 18 (emphasis added).  In addition, Boback has expressed his own understanding that the use of the word "leak" was used in the data security sector to describe files accessible via P2P networks.  ECF No. 418-1 ¶ 16.

Courts adjudicating the issues arising from the 1718 File have used similar language.  The United States Court of Appeals for the D.C. Circuit held it was undisputed that "the 1718 File was *publicly available* from a LabMD computer on LimeWire's peer-to-peer network, and that Tiversa

was able to access and download the file over that system." Daugherty v. Sheer, 891 F.3d 386, 391-92 (D.C. Cir. 2018) (emphasis added). Similarly, in describing the factual background of the Enforcement Action, the Eleventh Circuit stated that "the billing manager designated the contents of the 'My Documents' folder on her computer for sharing, *exposing* the content to the *other users*" and that the folder, from July 2007 to May 2008, contained the 1718 File. LabMD, Inc., 894 F.3d at 1224 (emphasis added). In yet another LabMD lawsuit arising out of these general facts, the Eleventh Circuit held that P2P networks "allow users to place *shared computer files* in folders that are *open for other users* to search via the internet." LabMD, Inc. v. Tiversa, Inc., 509 F. App'x 842, 843 (11th Cir. 2013) (emphasis added).

Consistent with these holdings, other courts addressing the issue of files available on P2P networks have held that the files are available to the public and that there is no reasonable expectation of privacy for files shared on P2P networks. See, e.g. Motown Record Co., L.P. v. Kovalcik, No. 07-cv-4702, 2009 WL 455137, at *3 (E.D. Pa. Feb. 23, 2009) (finding that because the accessed files were located in a shared folder on a P2P network, "[n]o authorization was needed since the files accessed were accessible to the general public"); Loud Records LLC v. Minervini, 621 F. Supp. 2d 672, 678 (W.D. Wis. 2009) (holding that files on P2P network were "accessible by the public"). While these cases address the issue in another context, they do confirm that referring to files on a P2P network as being accessible to the public is fairly routine.

Even Daugherty had used similar language in discussing the incident, both before and after any of the alleged statements had been made. In his 2013 book, *The Devil Inside the Beltway*, he described the inadvertent file sharing over P2P networks as "LimeWire leaks" and stated that "LimeWire was an unruly beast that could also cause [the billing manager] to expose her workstation files without her even knowing." ECF No. 418-4 at 5-8; ECF No. 641 ¶ 27. In a

December 16, 2013 interview, Daugherty referred to P2P networks as "leaky and sneaky" and said that "employees were using this and they were, without their knowledge, sharing important information." ECF No. 641 ¶ 124. In a November 23, 2015 interview, he stated that the 1718 File "was only exposed one folder on one file, and she, it was inadvertently shared." Id. ¶ 26(a). In a separate interview that same day, Daugherty said, "because one employee had LimeWire on one work station, they expose one folder against company policy." Id. ¶ 26(b).

After the alleged defamatory statements were made, on April 25, 2016, Bloomberg published an article about LabMD and Daugherty titled, "A Leak Wounded This Company. Fighting The Feds Finished It Off." ECF No. 631 ¶ 13. The article discussed that LabMD's billing manager had left the 1718 Report in a folder on LimeWire, "open for sharing with other users of the peer-to-peer network." ECF No. 631-3 at 2. Daugherty further discussed LabMD's fight with the FTC in his blog and explained that the company is "challenging whether a minor data leak of dubious origins that led to no consumer harm is subject to the FTC's authority." ECF No. 416 ¶ 13.

LabMD attempts to argue that these statements do not provide a relevant context because they were made without knowledge that Wallace had actually used EP2P to locate the 1718 File for Tiversa. Again, whether Wallace used EP2P is not relevant, however, because *The Pathology Blawg* article, did not relate to how the file was found. In relevant part, Boback asserted that the 1718 File was "publicly available" and "exposed" because a LabMD employee installed LimeWire on her computer. The details of how Wallace did, or did not, access the file do not bear on the truth of these statements, let alone prove that Boback knew them to be false.

Likewise, LabMD's contentions that Tiversa and Boback have been inconsistent in discussing how the 1718 File was found and whether the file was ever on any other computer miss the mark. Again, the article does not discuss in any way how Tiversa obtained the file or whether

28

anyone else had actually accessed it; rather, it discussed how the file ended up on LimeWire in the first place. While actual malice may be shown by circumstantial evidence, such evidence "must tend to establish fabrication." Kuwait & Gulf Link, 216 A.3d at 1088. Boback and Tiversa's past inconsistent statements do not tend to show that they fabricated the fact that the 1718 File had been found on LimeWire.

Indeed, the thrust of LabMD's argument is not that Boback or Tiversa falsely stated that the 1718 File had been placed on LimeWire, but that they told only part of the overall story. The inclusion of a discussion of the enhanced software used to find the file and Boback and Tiversa's inconsistent statements about whether the file had been found on any other computers, according to LabMD, demonstrates that the file being on a P2P system alone did not lead to the chain of events resulting in the Enforcement Action. That may well be true, but what the Court is determining here is whether the specific alleged statements can be found to have been made with knowledge or reckless disregard of their falsity. That is simply not the case; Statement Nos. 10, 13, and 14 accurately convey the part of the story they were intended to address – the 1718 File's accidental exposure on a P2P network.

It would be similar to a situation where the plaintiff had physically left the door unlocked to a file containing sensitive information. It could be that only through specific algorithms could the defendant have known to even check that door and that only through enhanced surveillance techniques could it confirm that the door was unlocked. Yet, even if true, this does not change the fact that the door was not locked, nor does it make it false to say so.

Accordingly, LabMD cannot establish, particularly under the heightened evidentiary standard applicable here, that any of the statements included in Boback's article in *The Pathology*

29

*Blawg* were made with knowledge or reckless disregard of their falsity. As such, summary judgment is warranted as to LabMD's claims in Count II regarding Statement Nos. 10, 13, and 14.

b.      *The Wall Street Journal* **Statements**

LabMD fares no better with the statements included in Boback's letter to *The Wall Street Journal*, which included:

> LabMD, a Georgia-based cancer screening company, admits its own employee mistakenly exposed the confidential medical records of nearly 10,000 individuals on the Internet. (Statement No. 15).

> LabMD's CEO Michael Daugherty admits that a LabMD employee improperly installed LimeWire file-sharing software on a company computer. Doing so made confidential patient information publicly available over the Internet. (Statement No. 16).

> Using this information, LabMD discovered that it had peer-to-peer sharing software on a company computer. Without Tiversa's free information, LabMD would have never known it was continuing to publicly expose patient information. (Statement No. 17).

> The suggestion that Tiversa provided information on exposed files to the Federal Trade Commission as a means of retribution because LabMD didn't hire Tiversa is 100% false. (Statement No. 18).

ECF No. 631-2. As with the statements made in *The Pathology Blawg*, LabMD challenges the use of the words "expose" and "publicly available." However, the context of Boback's letter demonstrates a similar meaning to the use of those terms in *The Pathology Blawg*.

From the context of the letter, the use of the term "expose" or "exposed" in Statement Nos. 15, 17, and 18 referred to LabMD's billing manager having "improperly installed LimeWire file-sharing software on a company computer." Id. at 1. Indeed, the letter specifically explained that "[d]oing so made the confidential patient information publicly available over the Internet." Id. Therefore, the references alleged to be defamatory are clearly calculated to convey that the 1718 File was mistakenly placed on LimeWire and thereby exposed to access by the public. For all of

30

the reasons discussed above, nothing in the record provides clear and convincing evidence that Boback's understanding of that meaning was false.

LabMD points to evidence of Defendants' purported desire to retaliate against LabMD or Daugherty. Defendants' "ill will" or "desire to harm plaintiff's reputation," without more, however, is insufficient to establish actual malice. Lewis, 833 A.3d at 192; Pace v. Baker-White, 850 F. App'x 827, 831 (3d Cir. 2021) ("Actual malice does not connote ill will or improper motivation."). The particular evidence LabMD refers to, including Boback's negative comments to event organizers and purported falsehoods regarding the "spread" of the 1718 File, do not speak to Boback's knowledge or belief as to whether the 1718 File was "publicly available," "leaked," or "exposed." Indeed, because Boback routinely took the position that files available on P2P networks are publicly available, there is nothing to suggest this characterization was motivated by animus toward LabMD.

Accordingly, construing the evidence in the light most favorable to LabMD, LabMD has failed to meet the requisite threshold of proving actual malice with respect to any of the statements included in Boback's letter to *The Wall Street Journal*. As such, summary judgment is warranted as to LabMD's claims regarding Statement Nos. 15-18.

### 4.    Impact of Expert Evidence

Of course, Defendants previously raised similar arguments in seeking summary judgment in 2018. ECF Nos. 415, 420. This Court granted those motions based on a rationale similar to the one employed here. ECF Nos. 464, 465. As discussed, the Third Circuit vacated and remanded, determining that this Court abused its discretion in prohibiting LabMD from submitting expert declarations during the summary judgment phase given the need to "discern[] the falsity of the allegedly defamatory statements about LabMD 'leak[ing]' the 1718 File or making it 'publicly

31

available.'" LabMD, 4 F.4th at 187. The Circuit noted that such evidence "may have aided the actual malice inquiry, as it could have shed light on whether reckless disregard of the truth could be inferred from the allegedly false statements." Id.

Accordingly, while it did vacate and remand, the Third Circuit did not find that there were issues of material fact as to whether Boback's statements were made with actual malice so as to preclude summary judgment. Rather, it found that the Court was required to consider the expert evidence proffered by LabMD in making that determination.

On remand, LabMD has submitted expert reports from Daniel L. Regard II ("Regard") and Adam A. Fisk ("Fisk"). In his July 31, 2025 report, Regard opines that the 1718 File had not spread over the P2P network but that Tiversa falsified data to give the impression that it had. ECF No. 668-2 at 3. He further concluded that the 1718 File had not been found with publicly-available software but with EP2P provided to Wallace by the FBI. Id. at 3. He expressed that the file was never publicly shared via public versions of file-sharing software. Id. at 51.

Similarly, Fisk, in his report, states that the 1718 File "was never publicly accessible to any ordinary user of LimeWire or Gnutella due to the technical architecture of searching and downloading on LimeWire, the unique name of the file itself, and the existence of multiple redundant firewalls at LabMD." ECF No. 667-1 at 2. He further opines that the fact that the file never left LabMD's computers except through Tiversa's efforts "supports the idea that it would have been extremely difficult for ordinary users to find." Id. at 2-3.

While these reports are certainly probative as to the nature of P2P systems and the difficulty most users would have in locating the 1718 File, even in a folder designated for sharing on LimeWire, they do not address Boback's understanding of the terms "publicly available," "leak," and "exposure" as they relate to the fact that a LabMD employee had, in fact, put the 1718 File on

32

a P2P network. Rather, the experts discuss at length the veracity of Boback and Tiversa's claims about how the 1718 File had been obtained and whether it had proliferated on a P2P network. They further explain the difficulty a user would have in finding the file without enhanced software like the type used by Wallace. However, as the Court has explained many times, the articles containing the statements alleged to be defamatory discuss how the 1718 File ended up on LimeWire, not how Tiversa found it.

Regard acknowledges that "there appears to be no dispute that the 1718 File was on a LabMD computer, which had installed a copy of the file-sharing software called 'LimeWire.'" ECF No. 668-2 at 9-10. What changed, according to Regard, is "the story of how Tiversa ended up with the 1718 File, how LimeWire played a role, and whether or not this file was 'publicly available.'" Id. at 10. Likewise, Fisk states, "Critically for this discussion, it is important to note that LabMD's properly configured firewalls would not prevent a rouge employee from using LimeWire." ECF No. 667-1 at 4. Both Regard and Fisk, therefore, fully acknowledge the central point of both *The Pathology Blawg* article and *The Wall Street Journal* – that an employee, acting against LabMD policy, accidentally exposed the 1718 File via LimeWire.

At best, the expert reports could support an inference that, although in a folder shared on LimeWire, the 1718 File was still very difficult to find for ordinary P2P users. This is not sufficient to establish actual malice. First, it is important to remember "that just because files are 'hard to find' does not necessarily mean that they are not still public." United States v. Dodson, 960 F. Supp. 2d 689, 698 (W.D. Tex. 2013). Moreover, the specific statements at issue here do not discuss the ease or difficulty of accessing the 1718 File. They merely discuss the file being placed on a P2P network using words Boback claims characterized his understanding of the situation. As the

33

Court has discussed, there is not clear and convincing evidence that he knew or recklessly disregarded that his characterization was false.

In sum, the expert evidence does nothing more than support an alternative characterization of the public availability of the 1718 File.  It does not touch on Boback's subjective understanding and therefore does not demonstrate actual malice.[12]

## IV.    CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment filed by Defendant Robert J. Boback, ECF No. 643, and the Motion for Summary Judgment filed by Defendant Tiversa Holding Corp., ECF No. 645, will be granted, and summary judgment shall be entered in Defendants' favor on Count II of the Amended Complaint.  An appropriate Order follows.

Dated: May 21, 2026

BY THE COURT:

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:  All counsel of record via CM/ECF

---

[12]    Because the Court finds that LabMD cannot establish actual malice by clear and convincing evidence in any event, it does not reach Boback's argument that his reliance on the advice of counsel precludes a finding of actual malice.